Bob Pemberton, Justice
Although the Uniform Declaratory Judgments Act (UDJA)[1] is calculated to aid efficient resolution of legal disputes and accompanying uncertainty,[2] those salutary goals do not override recognized statutory and jurisdictional limitations on the UDJA's reach.[3] In these three related causes, we must ascertain the extent of similar limitations on another statute that authorizes a form of declaratory relief to resolve legal uncertainty, but with greater impact on the procedural framework that *659 would ordinarily govern a civil action-Chapter 1205 of the Government Code, titled "Public Security Declaratory Judgment Actions"[4] but commonly known as the "Expedited Declaratory Judgments Act" (the EDJA).[5] More specifically, we must address-apparently as a matter of first impression-the extent to which a river authority that has issued bonds paid and secured by revenues pledged from its water-sales contracts may invoke the EDJA as a vehicle for litigating subsequent rate disputes with customers under those contracts. Other key questions, also of first impression, concern whether the claims implicate the governmental immunity of municipal customers of the river authority and whether the EDJA permits venue in the Travis County district court below.
We conclude that a claim under color of the EDJA that would directly declare a customer liable for breaching its water-sale contract through its refusal to pay increased rates lies beyond the proper scope of that statute. However, we have determined that other claims, which seek in rem declarations regarding the legality and validity of the water-sales contracts and rates, are within the EDJA for the reasons we will describe herein, do not implicate government immunity, and may be brought in the Travis County venue.
BACKGROUND
Each of the three causes-an interlocutory appeal and two mandamus petitions-arises from a single underlying trial-level action that was initiated under color of the EDJA by the San Jacinto River Authority (SJRA), the appellee and real party in interest. The appellants and relators each appeared in the action in opposition to SJRA. The broader context of this action is formed by legal and policy disputes concerning groundwater in Montgomery County.
The Groundwater Reduction Plan[6]
Montgomery County, the county encompassing Conroe (its seat) and The Woodlands, is situated on the northern edge of what today is termed the "Greater Houston" metropolitan area. Historically, the primary source of water in Montgomery County has been groundwater extracted from the Gulf Coast Aquifer. As that county has experienced significant population growth in recent decades, professed concerns about long-term depletion of the aquifer prompted formation of the Lone Star Groundwater Conservation District, which has since required large-volume users, such as municipal utilities and private water-supply corporations, to formulate and ultimately implement plans for achieving significant percentage reductions in their respective groundwater usage. Implementation of this regime took place over several years, culminating in mandatory groundwater-usage cutbacks that took effect in January 2016.
Meanwhile, against the backdrop of these legal and policy developments, SJRA-a conservation and reclamation district created by the Legislature under Texas Constitution Article XVI, Section 59, and whose jurisdiction includes Montgomery *660 County[7] -spearheaded development of a "Groundwater Reduction Plan" (GRP) that it championed as a collective solution for area municipalities and other large-volume water users who would be facing the impending groundwater-usage cutbacks. The GRP, simply described, has entailed SJRA constructing and ultimately operating a water-treatment and distribution system that draws surface water from Lake Conroe,[8] which SJRA then sells to large-volume users, providing them an alternative to reliance on groundwater.
Over 80 entities, operating over 150 separate water systems, "participate" (as it is termed) as water customers under the GRP. Among them are the appellants and relators here-the municipalities of Conroe, Magnolia, and Splendora (the "Cities") and the private water utilities Quadvest, L.P.; Woodland Oaks Utility, L.P.; Everett Square, Inc.; E.S. Water Consolidators, Inc.; Utilities Investment Co., Inc.; and T&W Water Service Company (the "Utility Companies"). The relationship between SJRA and each of these GRP participants is founded on contracts formed against a statutory backdrop.
The Legislature has authorized SJRA to enter into contracts under which it sells water to "municipalities or other corporate bodies or persons, public or private" and establishes and collects rates and charges therefore.[9] Under color of these delegated powers, SJRA has executed a bilateral contract with each GRP participant. Each such "GRP Contract," as relevant to this case, contains materially identical terms that include an obligation of the participant to pay SJRA monthly charges derived from the volume of water the participant either takes from the new system or pumps from the ground. The amounts due are to be determined principally by multiplying the volumes by rates set by SJRA through a separate "Rate Order" that "shall be amended from time to time." SJRA's enabling statute requires that it set such fees and charges so as to generate revenues sufficient to cover its costs,[10] and the GRP Contracts further prescribe that "[t]he fees, rates, and charges adopted under the Rate Order shall at all times be the lowest" that are "consistent with good management practices by [SJRA]"; "consistent with [SJRA's] statutory and constitutional duties and responsibilities"; "just, reasonable, and nondiscriminatory"; and "necessary and proper" to meet specified financial needs of the GRP regime and project. The GRP Contracts also prescribe various procedural requirements with which SJRA must comply when promulgating a Rate Order.
*661 Among the financial needs that must be met through the rates and charges is repayment of debt. By statute, SJRA is authorized to issue, and it has issued, bonds to finance construction of the new surface-water plant and related infrastructure, paid and secured by revenues it obtains from its water sales to the GRP participants collectively.[11] Between 2009 and the 2016 inception of the proceedings below, SJRA had issued seven series of these revenue bonds, of which approximately $520 million in aggregate principal amount remained outstanding, most of which was held by the Texas Water Development Board. In connection with each bond series, SJRA's board adopted a resolution that, inter alia , authorized the bonds' issuance and delivery, specified the bonds' purpose and terms, and pledged certain revenues received from the GRP water sales to the bonds' payment and security. The pledged revenues included those necessary to pay operation and maintenance expenses for the GRP and Project, service the bond debt, and maintain a bond reserve fund.
SJRA's enabling act requires that its fees and charges from water sales shall be "sufficient to produce revenue adequate ... to pay the interest on or the principal of any bonds or other obligations issued by [SJRA] when and as same become due and payable and to fulfill any reserve or other fund obligations of [SJRA] in connection with such bonds," in addition to "pay[ing] expenses necessary to the operation and maintenance of [SJRA's] property and facilities ... and such other expenses as the Board of Directors shall deem necessary and proper for any purposes."[12] Further, each of SJRA's bond resolutions included covenants that SJRA would set rates and charges so as to generate revenues sufficient to cover the GRP's operation and maintenance expenses, debt service, and bond reserves, and would otherwise be in accordance with the GRP Contracts and enabling legislation. In turn, the GRP Contracts require SJRA to set rates and charges sufficient to "pay the principal of, interest on, and redemption prices or costs of any Bonds or other obligations of [SJRA] issued or incurred, or to be issued or incurred, in connection with the Project or the GRP" and "satisfy all rate covenants relating to any such Bonds or other obligations of [SJRA] relating to the Project or the GRP."
Prior to issuing each bond series, SJRA obtained statutorily required legal approvals from the Attorney General and registration with the Comptroller.[13] More specifically, *662 SJRA presented uncontroverted evidence below that it had submitted to the Attorney General, in connection with each bond series, the respective bonds, the corresponding bond resolutions, and underlying materials that included the GRP Contracts, the source of the revenues being pledged to the bonds. The approvals by the Attorney General and ensuing events are deemed by statute to render both the bonds and the GRP Contracts valid, binding, and "incontestable" in a court or other forum,[14] although the parties dispute the effect of that limitation.
The controversy
The City of Conroe is among the largest purchasers of water under the GRP, and it evidently played a commensurately significant role in negotiating the terms of the GRP Contract template with SJRA. These terms included the creation of a six-member advisory body on which the municipality has its own dedicated representative.
*663 But in more recent times, Conroe, joined by certain other GRP participants, has opted to oppose and not merely work within the GRP regime.
Conroe, the Utility Companies, and others challenged the groundwater-usage cutbacks as unconstitutional and in excess of statutory authority through suit against the District and its governing board in Montgomery County district court.[15] The conflict escalated further after SJRA adopted a new rate order, to be effective for the 2017 fiscal year (the 2017 Rate Order) that increased the rates and charges for water under the GRP Contracts. Shortly before the 2017 Rate Order was to take effect, the Conroe City Council issued a sharply worded resolution accusing SJRA of overcharging it in violation of its GRP Contract and questioning the legitimacy of the larger GRP program. The resolution also directed Conroe city staff to "refuse payment of the increase in fees, rates, or charges" and pay SJRA instead in accordance with the preexisting rates. The Magnolia City Council followed suit, adopting a resolution virtually identical to Conroe's and refusing to comply with the 2017 Rate Order.
SJRA countered by filing the action that gave rise to the three causes now before us. SJRA's pleading allegations include responses to what it terms the "false" assertions made by the Conroe City Council in its resolution opposing the 2017 Rate Order (Magnolia's parallel resolution is not mentioned), with emphasis on presenting what SJRA views as factual and legal justifications for the rate increase. According to SJRA, the increase-which it asserts had been recommended by the GRP advisory panel without opposition from Conroe's representative-was a "last resort" attributable to "a critical funding shortfall resulting from over two years of significantly below-average water demand in Montgomery County caused in large part by unexpectedly high rainfall amounts, which reduced water demand and GRP revenues." In light of these financial needs, SJRA concludes, it was acting within its powers under the GRP Contract in raising the rates, such that Conroe, not SJRA, is the party violating the contract, through its refusal to comply with the new rates.
In turn, SJRA prays for a declaration "that Conroe's refusal to pay the fiscal year 2017 rate is illegal and invalid, and its failure to pay is a breach of the GRP Contract." SJRA also seeks three additional sets of declarations that are couched in terms of SJRA's own authority:
that the SJRA is authorized to set rates for Participants pursuant to the procedures set forth in the GRP Contracts;
that the SJRA issued its fiscal year 2017 Rate Order, including the setting of its fiscal year 2017 rate, in accordance with the procedures set forth in the GRP Contracts; and
that the SJRA's fiscal year 2017 rate, Rate Order, and the GRP Contracts, including the Contract with Conroe, are legal and valid.
These features of SJRA's action, at least as they are addressed to Conroe, have some attributes of an ordinary declaratory-judgment action seeking to establish contract rights and liabilities against another party.[16] But SJRA insists that its *664 action is no ordinary declaratory-judgment suit because its claims, or at least some of them, invoke the EDJA.
The EDJA, as we have previously explained in other cases and will further discuss below,[17] creates a unique "in rem " and "class action" proceeding whereby an "issuer" of "public securities" can obtain declarations establishing the "legality" or "validity" of the securities and certain related official proceedings (termed "public security authorizations") through an extraordinarily expedited process in which the Attorney General is presumptively the only other party participating personally.[18] As for all other persons, the EDJA prescribes only publication notice directed to four categories of unidentified "interested parties,"[19] whose members may-albeit while being potentially subject to a substantial bond requirement-appear personally,[20] and regardless are deemed to comprise a "class" that is bound by the judgment by virtue of the publication notice alone.[21] Such an action may be brought "in a district court of Travis County or of the county in which the issuer has its principal office,"[22] and SJRA acted under color of this venue provision in filing its action in the district court below. "To the extent of a conflict or inconsistency between [the EDJA] and another law," the Act adds, "[the EDJA] controls."[23]
The EDJA has an acknowledged purpose and common use of quickly resolving pending or potential litigation that might otherwise disrupt the initial approval, issuance, and sale of public securities by Texas governmental entities; this was the context of the Texas Supreme Court's often-quoted observation in Buckholts Independent School District v. Glaser[24] that "a legislative purpose in enacting the [EDJA] was to stop 'the age-old practice allowing one disgruntled taxpayer to stop the entire bond issue by simply filing suit.' "[25] In this *665 case, by contrast, SJRA seeks to use the EDJA to litigate issues arising subsequent to the approval and issuance of public securities-indeed, several years afterward, as most of the revenue bonds material to this case were issued by SJRA in 2011. However, as SJRA points out, the EDJA explicitly allows actions to be brought "before or after the public securities are authorized, issued, or delivered," and also "before or after the attorney general approves the public securities" and "concurrently with or after the use of another procedure to obtain a declaratory judgment, approval, or validation."[26] Further, in Hotze v. City of Houston ,[27] as SJRA has also emphasized, this Court tacitly recognized that a municipality that had previously issued bonds paid and secured by revenues from its water utility could use the EDJA to obtain declarations establishing that it had legal authority under its city charter subsequently to enact and adjust new water rates via ordinance without obtaining voter approval.[28] SJRA has suggested *666 that its claims, which center on its authority to raise water rates impacting the revenues that secure previously issued bonds, are akin to those in Hotze .
More precisely, SJRA has contended that its claims come within an authorization, found in Section 1201.021 of the EDJA, empowering an "issuer" of "public securities" to "bring an action ... to obtain a declaratory judgment as to ... the legality and validity of each public security authorization relating to the public securities."[29] There is no dispute that SJRA is an "issuer" of "public securities" with respect to its GRP revenue bonds.[30] The point of contention has been whether SJRA's claims seek declarations regarding the "legality and validity" of one or more "public security authorization[s] relating to the public securities" in the sense Section 1205.021 permits.
The EDJA's current version includes a general definition of "public security authorization": "an action or proceeding by an issuer taken, made, or proposed to be taken or made in connection with or affecting a public security."[31] Additionally, Section 1201.021 itself enumerates six categories of "public security authorizations" that are "includ[ed]" within that class.[32] SJRA has urged that the subject matter of its claims-the GRP Contracts, the 2017 Rate *667 Order, and the rates charged thereunder-implicate two of the enumerated categories of "public security authorizations"-"the execution or proposed execution of a contract" and "the imposition of a rate, fee, charge, or toll or the enforcement of a remedy relating to the imposition of that rate, fee, charge, or toll"[33] -or at least come within the general definition, the latter being so because each is an "action" or "proceeding" that SJRA took or made "in connection with" or "affecting" its GRP revenue bonds. SJRA elaborates that "the [GRP Contract] revenues are pledged as the sole security for the bonds; SJRA's bond covenants require rates set in compliance with the GRP Contracts; and the GRP Contracts require SJRA to impose a rate at a level that enables payment of the bonds, operation of the plant, and funding reserves."
Also under color of the EDJA, SJRA seeks a judgment that would bind not only Conroe to its requested declarations, but also each of the eighty or so other participants that executed GRP Contracts, along with the Attorney General and Comptroller.[34] SJRA asserts that Conroe and all other GRP participants would fall within the Act's "class" of "interested parties" for which the Act prescribes only publication notice that has the effect of binding them to the ensuing judgment.[35] In turn, SJRA has purported to rely solely on the prescribed publication notice to bind all GRP participants collectively to the judgment even while acknowledging in its petition that it was aware of their respective identities.[36] Likewise, SJRA has styled its action as an ex parte proceeding-"Ex Parte San Jacinto River Authority "-and, in contrast to its publication notice to GRP participants, personally served the Attorney General with process. But SJRA also took the additional step of effecting personal service on Conroe, albeit while taking pains to label the municipality an "Interested Party" under the EDJA rather than a "defendant."
Proceedings below
After being served, Conroe filed a motion to transfer venue to Montgomery County and, subject thereto, a plea to the jurisdiction and answer. The two remaining Cities, Magnolia and Splendora, also appeared (as would be permitted for unnamed "interested parties" under the EDJA[37] ) and filed responsive pleadings that were materially similar to Conroe's. Additionally, the Utility Companies Quadvest and Woodland Oaks filed a joint motion to transfer venue, plea to the jurisdiction, answer, and counterclaim seeking rescission of their GRP Contracts. The remaining Utility Companies subsequently joined in the venue challenge.
The primary theme of all of these responsive filings was that SJRA's claims are not properly within the EDJA because they do not seek declarations as to "the legality and validity" of a "public security *668 authorization" in the sense Section 1205.021 contemplates, but instead seek to litigate what are substantively suits on contracts that properly lie outside the statute. This asserted absence of EDJA coverage was urged as a challenge to both jurisdiction and venue in the Travis County district court. The Cities also raised governmental immunity as an independent jurisdictional bar. And both the Cities and the Utility Companies asserted additional venue theories they viewed as requiring transfer to Montgomery County even if the EDJA had otherwise provided a basis for venue. These included reliance on the "major transaction" venue statute in conjunction with a GRP Contract provision specifying that "venue shall be in a court of competent jurisdiction located in Montgomery County, Texas."[38] SJRA filed responses and evidence, much of which we have already summarized.[39]
The district court denied the pleas to the jurisdiction and motions to transfer venue by written order that did not specify the grounds on which it had relied. No findings of fact and conclusions of law were requested or made.[40] The Cities jointly perfected an interlocutory appeal of the district court's order denying their pleas to the jurisdiction,[41] which we docketed as Cause No. 03-16-00785-CV. The Cities also jointly filed a companion petition for writ of mandamus seeking relief from the district court's order denying their motions to transfer venue, and the Utility Companies did the same with respect to their own venue challenges. We docketed the two mandamus proceedings as Cause Nos. 03-17-00014-CV and -00087, respectively.
ANALYSIS
As the central issue in their respective appellate proceedings, the Cities and the Utility Companies continue to contest whether SJRA's claims are within the EDJA. In arguments developed principally by the Cities, they accuse SJRA essentially of contriving tactical litigation advantage by dressing in EDJA guise contract claims that properly lie beyond that statute. This Court has previously held that questions regarding the EDJA's reach implicate the trial court's subject-matter jurisdiction to adjudicate the claims the Act would authorize.[42] The Cities, accordingly, press their arguments on that point within their interlocutory appeal as a basis for reversing the district court's denial of their plea to the jurisdiction. They also urge the same argument among the venue challenges *669 they present in their mandamus petition, as do the Utility Companies. And while the Utility Companies have not directly challenged the district court's jurisdictional ruling as to them, acknowledging that they "do not have the statutory right to take an interlocutory appeal from the denial of their plea to the jurisdiction," this jurisdictional issue is nonetheless before us to the extent their mandamus petition disputes whether SJRA's claims are within EDJA.[43] The Cities also bring forward their contention that SJRA's action is independently barred jurisdictionally by their governmental immunity.
Resolution of these questions turns chiefly on construction of the EDJA, a question of law that we review de novo.[44] We seek to determine the "Legislature's intent," which we discern "from the objective meaning of the words chosen, read with precision and viewed in the context in which they are used."[45] Although we generally ascribe the "plain" or "ordinary" meaning to the words chosen, we must also take account of statutory definitions as well as technical meanings apparent from statutory or jurisprudential context.[46]
EDJA coverage
The primary thrust of the Cities' arguments disputing the EDJA's applicability is that the Act, once read as a whole, reveals critical contextual limitations on the breadth of what might otherwise appear to be a plain-meaning reading of Section 1205.021 and the "public security authorization" definition it incorporates. Based on that analysis, the Cities posit there are two related limitations that exclude SJRA's claims from coverage. First, the Cities maintain that the EDJA, properly read, cannot be used to litigate rights that are created by or sound in contract, as they perceive SJRA's claims to do, but is confined solely to addressing issues regarding an issuer's constitutional or statutory authority to undertake official actions relating to public securities. Second, the Cities contend that the EDJA does not permit litigation of personal rights, such as competing claims of contract rights as between counterparties, but only of so-called "public rights" to challenge governmental action that are shared in common with broad classes of citizenry and do not rise to the level of Due Process-protected "property" or "liberty" interests.[47]
*670 The upshot of the Cities' position is that the EDJA is merely a means of resolving pending or potential challenges to the issuer's constitutional or statutory authority to issue securities or take related official actions that would otherwise be raised, if at all, by plaintiffs suing in reliance on taxpayer standing,[48] i.e., the scenario in Glaser . "For example," the Cities posit, "a city, county, or sports authority could enter into a contract to build a stadium for a professional sports team and fund that construction with public bonds," in response to which "[t]axpayers, property owners, or other members of the public might sue claiming the contract is unlawful because the particular unit of local government lacks authority to enter into a contract to build a sports facility, the contract deviates from which the voters approved in a bond election, or more generally, that the contract proposes unconstitutionally to spend public money for private gain." Those " 'public rights,' " the Cities reason, "are the types of rights the EDJA is designed for litigating; and those 'public rights' are the only rights that may be extinguished by an EDJA action."[49] Conversely, the Cities urge, SJRA's construction would improbably transform the EDJA into a "Uniform Declaratory Judgments Act on steroids," enabling "municipal airport authorities to bring EDJA suits on leases with airlines, bookstores, and pizza parlors merely [if] the airports pledged rentals from those leases for payment of airport bonds" or "[m]unicipal convention centers to sue entertainers and organizers of trade shows under the EDJA [if] the proceeds from their contracts are dedicated to retiring convention center bonds."[50]
*671 The Cities derive this construction from three features of the EDJA. First, the Cities insist that Section 1205.021 's references to specific categories of "public security authorizations"-"the execution or proposed execution of a contract" and "the imposition of a rate, fee, charge, or toll," and which also includes "the imposition of an assessment, a tax, or a tax lien," "the election at which the public securities were authorized," "the organization or boundaries of the issuer," and "the pledge or encumbrance of a tax, revenue, receipts, or property to secure the public securities"[51] -contemplate inquiry into whether the issuer's exercise of governmental power complied with constitutional or statutory limitations, as distinguished from adjudication of rights created or conferred through contract. In other words, they reason, an issuer's authority under constitution or statute to initially "execute" or form a contract may be inquired into in determining "legality" or "validity" under the EDJA, but disputes concerning competing claims of right under or on the contracts themselves, as between counterparties, may not be. Similarly, the Cities urge that the Legislature's use of "imposition" with reference to rates or taxes was intended in the sense of the Black's Law Dictionary definition of "impose," "to levy or exact (a tax or duty),"[52] which in their view denotes the exercise of governmental power to set rates or taxes.
Second, the Cities argue that their narrower reading is necessary to give effect to the EDJA's proviso that "[a]n action under [the EDJA] is ... a proceeding in rem."[53] As they correctly observe, the term "in rem " has a well-established technical meaning denoting an action or proceeding in which the trial court is said to exercise jurisdiction over some "thing" or res to determine claims in or legal status of the res as "against all the world."[54] While public rights regarding an issuer's constitutional or statutory authority to undertake official actions might be adjudicated "against the world," the Cities suggest, contract rights between specific parties would not be.
Third, the Cities urge that their construction is necessary to avoid a constitutional defect arising from the EDJA's notice requirements. As noted previously, the EDJA entitles only the Attorney General to personal notice of the action (specifically, personal service) and opportunity to *672 appear.[55] As for all other persons, the Act prescribes only newspaper publication addressed to, "in general terms and without naming them," four categories of "interested parties": "all persons who: (1) reside in the territory of the issuer; (2) own property located within the boundaries of the issuer; (3) are taxpayers of the issuer; or (4) have or claim a right, title, or interest in any property or money to be affected by the public security authorization or the issuance of the public securities."[56] This publication notice alone is also deemed to make each "interested party" into "a party to the action" and confer on the trial court "jurisdiction over each [such] person to the same extent as if that person were individually named and personally served in the action."[57] Likewise, the EDJA proceeding is deemed to be a "class action" that is "binding on all persons" who fall within one of the four categories of "interested parties."[58]
In the Cities' view, EDJA's truncated form of notice to persons other than the Attorney General and expansive preclusive effect confirm that the Act can operate only with respect to public rights that do not implicate Due-Process protections.[59] Were the EDJA to extend to extinguishing the "private" or "in personam contract rights" of the GRP Contract participants, the Cities reason, it would run afoul of United States Supreme Court precedents holding that publication notice, whether in the context of a proceeding classified as "in personam " or "in rem ," is insufficient constitutionally as to a person possessing a liberty or property interest implicated by the proceeding and whose identity and location is known.[60] Relatedly, the Cities refer us to cases in which courts have rejected Due-Process challenges to the notice provisions of the EDJA or similar bond-validation statutes precisely because the courts perceived the statutes implicated only public rights and no constitutionally protected property or liberty interests.[61] By negative implication, the Cities reason, the EDJA would violate Due Process under the logic of these cases if the Act were applied in a manner implicating protected property or liberty interests.
To date, no Texas court, as far as we can tell, has directly addressed or resolved these sorts of contentions regarding the EDJA. Urging otherwise, SJRA assures us that Texas courts "for more than half a century" have exercised jurisdiction under the EDJA or its predecessors to litigate issues concerning the "legality" or "validity"
*673 of contracts that secure public securities. This precedential support is more limited than SJRA suggests. While there are authorities recognizing that the EDJA may be used to litigate the "legality" or "validity" of a contract securing public securities, SJRA refers us to no case, nor has our own extensive research revealed any, holding that this inquiry may extend to determining disputed rights under those contracts, as between the issuer and counterparties, as the Cities and Utility Companies complain is occurring here. The case on which SJRA primarily relies, the 1963 Court of Civil Appeals decision in Hatten v. City of Houston ,[62] does not stand for the proposition that the EDJA can be used in this way. Hatten involved an issuer's use of a predecessor to the EDJA to determine, in the context of legal challenges to municipal bonds raised by a "group of citizens," the "validity" of contracts that were a source of revenues and property pledged by the issuer to secure the bonds.[63] There is no indication in Hatten of any dispute regarding the respective rights of the issuer and the counterparties under the contracts themselves, nor that the contract "validity" inquiry extended to determining anything other than the public-rights issues that might be raised by a third-party "group of citizens."[64] To this extent, Hatten is arguably consistent with the Cities' premise that the EDJA is a device for adjudicating public-rights issues.
Similarly unavailing are SJRA's suggestions that this Court in Hotze endorsed an expansive view of the EDJA that would refute its opponents' complaints. SJRA points merely to statements in an introductory summary of the Act's features that were not a focus of this Court's analysis and holdings.[65] And Hotze , as the Cities *674 point out, is another example of an EDJA case that involved litigation over public-rights issues-the issuer, the City of Houston, sought declarations as to whether its charter permitted it to raise water rates by ordinance without voter approval.[66]
Yet the Cities and the Utility Companies likewise cannot point to any case that squarely rejects SJRA's construction, either. While they echo Glaser 's observation about "a legislative purpose" of the EDJA being aimed at the litigious "disgruntled taxpayer" who disrupts an anticipated bond issue, this statement did not represent a determination by the Texas Supreme Court of the EDJA's outer bounds.[67] However, the Cities and Utility Companies insist that this Court's analysis in Guadalupe-Blanco River Authority v. Texas Attorney General ( GBRA )[68] points to a narrow construction that would exclude SJRA's claims.
Due-Process implications
We will begin with the Cities' arguments founded on perceived Due-Process problems with the EDJA's notice provisions. In this regard, it is important to understand what the Cities are not arguing. The Cities stop short of directly challenging the constitutionality of the EDJA's notice provisions, either facially or as applied. Their argument is instead that we must, as a matter of statutory construction, infer limitations on the EDJA's scope that would avoid implicating protected "liberty" or "property" interests and confine the statute's impact solely to public-rights issues.[69]
We must reject this proposed construction because the EDJA, as written, cannot support it textually. The Act defines a "class" of "interested parties" impacted by the claims and judgment that includes, inter alia , persons who "have or claim a right, title, or interest in any property or money to be affected by the public security authorization or the issuance of the public securities" and "taxpayers of the issuer," all without qualification or limitation.[70] These categories unambiguously would encompass not only persons who would possess only a generalized public right in the claims being adjudicated, but also some persons possessing particularized liberty or property interests enjoying Due-Process protections. Among examples of the latter would be existing bondholders whose interests are implicated by the action[71] and a taxpayer with respect to a *675 levy on the taxpayer's own property.[72] These statutory features defy the Cities' notion that the EDJA must or can be construed to include an implied exclusion of claims that would implicate interests having Due-Process protection.
While it is true that we should construe statutes "when possible " so to avoid constitutional defects,[73] this principle does not give us license to judicially rewrite the EDJA to exclude coverage of these or other Due-Process-protected interests in the absence of a textual basis for doing so. In other words, if the Cities are correct that the EDJA's notice provisions give rise to Due-Process problems, their remedy is instead to bring a proper constitutional challenge to the statute's enforcement. Again, they have not purported to present or preserve such a challenge here, nor have the Utility Companies.[74]
SJRA's "contract" claims
Our rejection of the Cities' proposed public-rights limitation on the EDJA's scope does not wholly resolve their argument that the Act, read as a whole, excludes SJRA's claims because these concern contractual rights rather than SJRA's statutory or constitutional authority. To this argument, SJRA responds in part that its claims do not seek to litigate contract rights in the manner of an ordinary contract dispute involving a governmental entity or private parties. Rather, SJRA points out, its claims arise within and implicate a surrounding statutory framework that confers elevated legal status upon its obligations under the GRP bonds and to the GRP Contracts that secure those obligations.
Following approval by the Attorney General and registration with the Comptroller, as explained previously, both the GRP bonds and the GRP Contracts were statutorily deemed to be "incontestable."[75] This process serves to assure bondholders of their secure title[76] and also has a constitutional dimension.[77] And through its bond covenants, SJRA committed to its bondholders that it would, among other things, set its rates and charges so as to generate revenues sufficient to pay GRP's operation and maintenance expenses, service the GRP bonds, and fund specified bond reserves. SJRA's enabling legislation independently *676 imposed similar obligations.[78] The bond covenants also required that SJRA comply with the GRP Contracts in setting the rates. In turn, the GRP Contracts required SJRA to set rates and charges sufficient to "pay the principal of, interest on, and redemption prices or costs of any Bonds or other obligations of [SJRA] issued or incurred, or to be issued or incurred, in connection with the Project or the GRP," "satisfy all rate covenants relating to any such Bonds or other obligations of [SJRA] relating to the Project or the GRP," and comply with various procedural requirements.
Against this backdrop, SJRA suggests, its EDJA claims reduce to seeking confirmation that the GRP Contracts, like the bonds they secure, are "incontestable"; that its bond covenants and/or enabling statute compelled it to raise its rates as it did; and that it otherwise complied with the bond covenants (which also incorporate the requirements of the GRP Contracts) in promulgating the Rate Order and rates. The Cities dispute that the statutory "incontestability" of the GRP Contracts can operate against persons other than the issuer or the State, although they acknowledge this question is not yet before us. For present purposes, rather, we need only observe that SJRA's claims, for the reasons it identifies, are ultimately rooted in statutory law, thereby refuting the Cities' premise that SJRA is seeking to litigate an ordinary contract dispute through the EDJA. And we are unpersuaded that the Legislature intended to exclude from Section 1205.021 SJRA's claims-which concern contracts, a rate order, and rates that were "taken or made in connection with or affecting" the GRP bonds under any ordinary definition (i.e., are public security authorizations)-merely because the "legality" or "validity" issues they present may involve some consideration of terms within the GRP Contracts in connection with the statutes.
While he has not filed briefing at the appellate level, the Attorney General submitted filings below, included in our record, in which he advocated similar ultimate conclusions regarding the EDJA's application here. He maintained that "because the [GRP Contracts] form the basis for the revenues derived thereunder to be pledged to the bonds" and those revenues are obtained through a Rate Order, both the GRP Contracts and 2017 Rate Order are "public security authorizations" within the meaning of the EDJA. The Attorney General further argued that any dispute regarding the "legality" or "validity" of the GRP Contracts had already been resolved by their statutory "incontestability," leaving at issue only the district court's jurisdiction under the EDJA to decide SJRA's claims regarding the 2017 Rate Order and rate increase. As for those claims, the Attorney General reasoned that "[i]f SJRA had to increase rates to comply with its bond covenants " requiring it to charge fee rates sufficient for operation and maintenance expenses, payment of bond debt service, and deposit of required bond reserve funds, "asking the [district court] to declare the Rate Order valid would be a proper claim under the Act."[79] The Attorney General similarly discerned that the district court would have subject-matter jurisdiction under the EDJA to determine "whether the increased rates were authorized under the [GRP Contracts] and pursuant to the Rate Order," additional requirements prescribed in SJRA's bond covenants.
*677 The in rem nature of EDJA actions
However, one of the Cities' context-based arguments has merit, albeit with respect to only one of SJRA's claims. SJRA's claim for a declaration "that Conroe's refusal to pay the fiscal year 2017 rate is illegal and invalid, and its failure to pay is a breach of the GRP Contract" is fundamentally incompatible with the "in rem " nature of the action that the EDJA creates.
As both sides have acknowledged, a distinguishing and fundamental feature of an action and judgment in rem is that their effect is "limited to the property that supports jurisdiction and does not impose a personal liability."[80] To impose personal liability, the rule goes, a court must instead exercise in personam jurisdiction,[81] which is ordinarily characterized by proceedings brought against one or more specific persons to obtain a judgment enforcing personal rights or liabilities against them.[82] Consequently, by declaring that an EDJA action is a "proceeding in rem ,"[83] the Legislature signaled that the trial court would have jurisdiction to determine "legality" or "validity" issues regarding "public securities" and "public security authorizations" as against existing or potential objectors, but not jurisdiction extending to affirmatively enforcing personal rights or liabilities against such persons.[84]
This analysis is not altered by EDJA provisions that are calculated to bind a "class" of "interested parties" to the in rem judgment.[85] These provisions still *678 must be read in conjunction with the Legislature's declaration that the action is "a proceeding in rem ,"[86] a phrase that belies intent to impose personal liability. The net effect is that the EDJA purports to bind "interested parties" to a judgment that can foreclose interests they possess in disputing the "legality" or "validity" of "public securities" or "public securities authorizations"-i.e., a judgment that is defensive in nature in resolving claims by "interested parties"-but does not extend to imposing personal liability against "interested parties" affirmatively.[87]
SJRA overtly seeks to impose personal liability against Conroe through SJRA's claim for a declaration "that Conroe's refusal to pay the fiscal year 2017 rate is illegal and invalid, and its failure to pay is a breach of the GRP Contract." That claim is accordingly beyond the EDJA, which authorizes only an in rem action. This is so even if the claim might otherwise be authorized by the EDJA provisions on which SJRA relies, as these provisions must be read in context with the overarching "in rem " character of the EDJA action.[88]
But SJRA's other three claims-seeking declarations "that the SJRA's fiscal year 2017 rate, Rate Order, and the GRP Contracts, including the Contract with Conroe, are legal and valid"; "that the SJRA is authorized to set rates for Participants pursuant to the procedures set forth in the GRP Contracts"; and "that the SJRA issued its fiscal year 2017 Rate Order, including the setting of its fiscal year 2017 rate, in accordance with the procedures set forth in the GRP Contracts" (the "Remaining Claims")-do not directly seek to impose personal liability on Conroe or other GRP participants. Rather, aside from a single reference to "the [GRP] Contract with Conroe" in the first claim, these claims purport solely to seek declarations as to SJRA's own rights and the legal status of its own acts, without explicit regard to any other person or party.
The Cities suggest that the Remaining Claims, even if not affirmatively imposing liability, are nonetheless incompatible with an in rem action because they still implicate the contract rights or other personal interests of GRP participants and do not operate merely against "all the world." We disagree. This argument is founded in part on the Cities' flawed premise that SJRA's *679 claims seek merely to litigate contract rights. Likewise, the conceptual difficulties the Cities suggest are resolved by recognizing the close relationship between the GRP Contracts, Rate Order, and rates and SJRA's compliance with its covenants under the GRP bonds themselves, the res whose legal status is the EDJA's ultimate focus. And to the extent the Cities are maintaining that adjudication affecting personal or particularized rights rather than public rights is inherently incompatible with an in rem action, they are similarly mistaken.[89]
GBRA
The final argument presented by the Cities or the Utility Companies to dispute EDJA coverage is that this Court's analysis in GBRA stands for a narrow construction of the EDJA that excludes all of SJRA's claims. We are unpersuaded that GBRA alters the analysis.
Similar to SJRA's reliance on Hotze , the Cities and Utility Companies emphasize generalized, shorthand descriptions of EDJA provisions that appear within the GBRA memorandum opinion.[90] As in Hotze , such references must be read in their proper context. GBRA had filed what it styled as an EDJA action to declare the "legality" or "validity" of "public security authorizations" that included the authority's determination to construct a water-storage project for purposes of providing "firm" water supply to customers, its issuance of $100 million in bonds to fund the project, its execution of water-supply contracts to sell the water, its pledge of contract revenues to secure and pay the bonds, the rate it intended to charge under the contracts, and its proposed expenditures related to the bonds.[91] However, the substantive focus of GBRA's claims, at least as the arguments were framed on appeal, was to establish GBRA's legal right to a specific volume of Guadalupe River water that GBRA deemed necessary for it to perform under the contracts and generate revenues sufficient to pay the bonds.[92] In that regard, GBRA sought to use the EDJA as a vehicle for obtaining a favorable declaration of its water rights as against the competing upstream interests of the San Antonio Water System (SAWS), which had filed a permit request with the Texas Commission on Environmental Quality (TCEQ) to reuse effluent that SAWS had previously been discharging into the river.[93] Upon challenge by SAWS and others, this Court held that the EDJA did not extend so far.[94] The gist of this Court's reasoning was that GBRA's claimed rights to a particular volume of water simply had too attenuated and too contingent a relationship to the "legality" or "validity" of GBRA's bonds or any related *680 official actions to be actionable under Section 1205.021. While GBRA thus confirms that the EDJA has some outer limits, its factual dissimilarities to this case-GBRA's claims were the analogue of SJRA seeking to litigate under the Act its underlying right to take water from Lake Conroe-caution against our extrapolating broader principles to guide us here.
* * *
We conclude, for the reasons stated, that SJRA's Remaining Claims (seeking declarations "that the SJRA's fiscal year 2017 rate, Rate Order, and the GRP Contracts, including the Contract with Conroe, are legal and valid"; "that the SJRA is authorized to set rates for Participants pursuant to the procedures set forth in the GRP Contracts"; and "that the SJRA issued its fiscal year 2017 Rate Order, including the setting of its fiscal year 2017 rate, in accordance with the procedures set forth in the GRP Contracts") are within the EDJA. However, SJRA's claim for a declaration "that Conroe's refusal to pay the fiscal year 2017 rate is illegal and invalid, and its failure to pay is a breach of the GRP Contract" is not.
We proceed to consider the remaining issues of governmental immunity and venue with respect to the Remaining Claims only.
Governmental immunity
The Cities urge, and there appears to be no question, that they executed their GRP Contracts incident to the "governmental" function of operating their respective municipal water utilities,[95] such that they would derivatively enjoy the State's sovereign immunity, i.e., have "governmental immunity," with respect to those contracts.[96] Further, while the Cities have waived their governmental immunity from liability under the GRP Contracts by entering into those agreements, the Cities have retained their immunity from suit unless and to the extent waived by the Legislature.[97] This immunity from suit, if implicated by SJRA's claims and not waived by the Legislature, would deprive the district court of subject-matter jurisdiction to adjudicate the claims.[98]
The Cities urge that SJRA's claims, including the Remaining Claims, implicate their governmental immunity. SJRA responds *681 that "[i]mmunity is simply not an issue" due to the in rem nature of the claims or alternatively because immunity has been waived by the Legislature. But we need only observe that the Cities' assertion of immunity presumes, similar to their arguments regarding the EDJA's scope, that the Remaining Claims are substantively in the nature of ordinary claims to enforce government contracts, a category of claims that would typically implicate immunity even if not formally asserted against a government entity directly.[99] The reality of SJRA's Remaining Claims, again, involves a much more complex interplay between the GRP Contracts, the GRP bonds and bond covenants, SJRA's enabling statute, and statutory "incontestability" provisions.
Assuming without deciding the Remaining Claims could otherwise implicate the Cities' immunity, these features of the claims, if meritorious, would also bring them within a recognized "exception" holding that immunity is not implicated by claims that would enforce an underlying statutory or constitutional requirement "that government contracts be made or performed in a certain way, leaving no room for discretion."[100] Such requirements or duties in this case would be formed by SJRA's enabling statute and the statutes deeming "incontestable" the GRP bonds (including bond covenants) and the GRP Contracts. Against this backdrop, if as GRP asserts the GRP Contracts are statutorily beyond legal challenge, that SJRA was compelled by its bond covenants or enabling statute to raise its rates, and that SJRA otherwise complied with its bond covenants and GRP Contracts in doing so, SJRA's claims would not implicate the Cities' governmental immunity.
Venue
The foregoing holdings also partially resolve the venue challenges raised through the two mandamus petitions. The Cities and Utility Companies have each argued that SJRA cannot rely on the EDJA's venue provision because SJRA failed to invoke that statute. Because we have held that the Remaining Claims invoke the EDJA and are not otherwise barred jurisdictionally, it follows that the Act's venue provision would, all other things being equal, permit SJRA to bring those claims "in a district court of Travis County or of the county in which the issuer has its principal office."[101] SJRA opted for the former, filing its action in the Travis County district court below.
In the alternative, the Cities and Utility Companies urge that even if the EDJA would otherwise permit venue in Travis County, venue is fixed instead in *682 Montgomery County by virtue of the "major transaction" venue statute, Section 15.020 of the Civil Practice and Remedies Code. Section 15.020 is a mandatory-venue statute requiring enforcement of contractual venue-selection provisions in certain actions arising from a "major transaction," defined as "a transaction evidenced by a written agreement under which a person pays or receives, or is obligated to pay or receive, consideration with an aggregate stated value equal to or greater than $1 million."[102] The Cities and Utility Companies insist that SJRA's action arises from a "major transaction" in this sense required by Section 15.020, thereby mandating enforcement of the GRP Contracts' venue provisions, which specify "a court of competent jurisdiction located in Montgomery County, Texas." This requirement, they continue, trumps SJRA's choice of Travis County under the EDJA either because the EDJA's provision is permissive and therefore must yield, or because the two statutes must be reconciled by fixing venue in Montgomery County, the sole county for which venue could be proper under both statutes. In either case, they conclude, the district court abused its discretion in overruling their motions to transfer the cause to Montgomery County.
In response, SJRA disputes that Section 15.020, even by its own terms, can have any application here. SJRA points out that Section 15.020 expressly "does not apply to an action if ... venue is established under a statute of this state other than this title."[103] Its EDJA action falls under this exception, SJRA argues, because venue "is established under" a Texas statute other than "this title" (i.e., Title 2 of the Civil Practice and Remedies Code), namely under the EDJA, a component of the Government Code. The Cities and Utility Companies counter by insisting that venue "is established under " a statute outside of Title 2, so as to come within the exception, only if that external statute prescribes mandatory venue, which in their view the EDJA does not. We agree with SJRA.
Section 15.020 's exception does not specify that the external statute must prescribe mandatory as opposed to permissive venue, only that "venue"-without further qualification or limitation-"is established under a statute other than this title."[104] Nor is that limitation inherent or implied in the phrase or concept of venue "established under" a statute as used in the context of Chapter 15 of the Civil Practice and Remedies Code. Throughout Chapter 15, the Legislature used "establish" or "established" venue to denote a plaintiff's demonstration merely that venue is "proper," whether that determination is governed ultimately by a mandatory venue provision, one of Chapter 15's general permissive venue provisions, or some other permissive venue provision.[105] Absent any *683 contrary textual indications, we conclude the Legislature used "venue ... established under a statute of this state other than this title" in this same sense, thereby excluding from Section 15.020 claims for which the plaintiff-as SJRA here-has demonstrated venue under some statute not within Title 2, whether that statute be a mandatory or permissive provision. Consequently, because SJRA has demonstrated that venue lies in Travis County under the EDJA, Section 15.020 cannot aid the Cities and the Utility Companies.
While this holding concludes our analysis of the Utility Companies' arguments, the Cities also seek mandamus relief regarding an additional ground for transfer they had asserted below. That ground was Civil Practice and Remedies Code Section 15.002, Subsection (b), the provision allowing discretionary transfer "[f]or the convenience of the parties and witnesses and in the interest of justice."[106] The Cities acknowledge the obvious barrier to appellate relief regarding that ground-the Legislature has specified that "[a] court's ruling or decision to grant or deny a transfer under Subsection (b) is not grounds for appeal or mandamus and is not reversible error."[107] But the Cities insist that they are not seeking review of the district court's order, per se , but asking merely that we "interpret[ ] statutes and establish[ ] legal standards for application by lower courts" and "provid[e] guidance through mandamus" regarding the method by which trial courts should analyze Subsection (b) transfer requests. In the Cities' view, trial courts should apply the analysis in Atlantic Marine Construction Company v. United States District Court ,[108] a 2013 United States Supreme Court decision case that enforced a forum-selection clause under a federal statute that the Cities deem "virtually identical" to Subsection (b). Upon issuing this "appellate guidance," the Cities continue, we "should direct [the district court] to reconsider the Cities' section 15.002(b) motion under the proper Atlantic Marine standards." The Cities thus ultimately seek our intervention to disturb the district court's denial of the Cities' Section 15.002(b) ground, contrary to the Legislature's proscription of that review. But even if we could entertain the Cities' request, we remain unpersuaded that we should promulgate the "appellate guidance" the Cities propose.
CONCLUSION
We reverse the district court's order in part and dismiss, for want of jurisdiction, SJRA's claim for a declaration "that Conroe's refusal to pay the fiscal year 2017 rate is illegal and invalid, and its failure to pay is a breach of the GRP Contract." But with respect to SJRA's other claims (what we have termed the "Remaining Claims"), we affirm the district court's order denying the Cities' plea to the jurisdiction. We also deny the two mandamus petitions.

Tex. Civ. Prac. & Rem. Code ch. 37.

See id. § 37.002(b) ("This chapter is remedial; its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and it is to be liberally construed and administered."); see also MBM Fin. Corp. v. Woodlands Oper. Co. , 292 S.W.3d 660, 670 (Tex. 2009) ("The [UDJA] was originally 'intended as a speedy and effective remedy' for settling disputes before substantial damages were incurred ... [one that is] is simpler and less harsh than coercive relief" (quoting Cobb v. Harrington , 144 Tex. 360, 190 S.W.2d 709, 713 (1945), and Restatement (Second) of Judgments § 33 cmt. c (Am. Law Inst. 1982) ) ).

See, e.g. , Texas Dep't of Transp. v Sefzik , 355 S.W.3d 618, 621-22 (Tex. 2011) (per curiam) ("[W]e have consistently stated [that] the UDJA does not enlarge the trial court's jurisdiction but is 'merely a procedural device for deciding cases already within a court's jurisdiction.' " (quoting Texas Parks & Wildlife Dep't v. Sawyer Trust , 354 S.W.3d 384, 388 (Tex. 2011) ) ); see also Ex parte Springsteen , 506 S.W.3d 789, 799 (Tex. App.-Austin 2016, pet. denied) ("[A]s the high court has clarified in recent years, the UDJA's sole feature that can impact trial-court jurisdiction to entertain a substantive claim is the statute's implied limited waiver of sovereign or governmental immunity that permits claims challenging the validity of ordinances or statutes." (citing Texas Lottery Comm'n v. First State Bank of DeQueen , 325 S.W.3d 628, 634-35 (Tex. 2010), and Texas Educ. Agency v. Leeper , 893 S.W.2d 432, 446 (Tex. 1994) ) ).

See generally Tex. Gov't Code ch. 1205.

See Guadalupe-Blanco River Auth. v. Texas Att'y Gen. , No. 03-14-00393-CV, 2015 WL 868871 *1, 2015 Tex. App. LEXIS 1795 *1 (Tex. App.-Austin Feb. 26, 2015, pet. denied) (mem. op.) (GBRA ) (observing that Chapter 1205 "is commonly referred to as the Expedited Declaratory Judgment Act").

Our description of underlying events and transactions draws upon undisputed pleading allegations and evidence presented to the district court.

See Tex. Const. art. XVI, § 59 ; Act of May 12, 1937, 45th Leg., R.S., ch. 426, 1937 Tex. Gen. Laws 861, 861-69. As the name suggests, SJRA's stated mission is "to provide through every practical and legal means for the control and the coordination of the regulation of the waters of the watershed of the San Jacinto River and its tributaries." Id. § 3(a), 1937 Tex. Gen. Laws at 862.

SJRA originally constructed and now operates Lake Conroe and shares ownership of the impounded water with the City of Houston.

See Act of June 14, 1967, 60th Leg., R.S., ch. 547, § 3(xviii), 1967 Tex. Gen. Laws 1212, 1214 (allowing SJRA to "enter into such contracts, upon such terms and for such periods of time as the Board of [SJRA] might approve, with municipalities or other corporate bodies or persons, public or private, for the purpose of establishing and collecting, and by resolution or order to otherwise establish or collect, rates and other charges for the sale or use of water, water transmission, treatment or connection facilities, sewage or industrial or other waste disposal services and facilities or all types, park or recreation facilities, power, electric energy and any other services sold, furnished or supplied by [SJRA]").

See ids="6939652" index="13" url="https://cite.case.law/sw3d/433/523/#p529">id.

See ids="6939652" index="14" url="https://cite.case.law/sw3d/433/523/#p529">id. § 4, 1967 Tex. Gen. Laws at 1216. The parties also assert that the bonds were issued under Chapter 49 of the Water Code and, according to SJRA, also Chapter 1371 of the Government Code. See infra note 13.

Act of June 14, 1967, 60th Leg., R.S., ch. 547, § 3(xviii), 1967 Tex. Gen. Laws at 1214.

Although there is no dispute that SJRA complied with any applicable prior approval or registration requirement, the parties differ somewhat as to which specific statute or statutes imposed those requirements here. SJRA cites to approval and registration requirements found in three different statutes-Section 49.184 of the Water Code, Chapter 1371 of the Government Code, and Chapter 1202 of the Government Code. The Cities dispute that Chapter 1371 is implicated and emphasize Water Code Section 49.184 instead. For present purposes, we need only note that each of these statutes imposes some version of (1) a requirement that a governmental issuer of bonds submit the bonds and certain underlying materials to the Attorney General for legal review and approval, (2) following which the Comptroller is to register the bonds. See Tex. Gov't Code §§ 1202.003 ("Before the issuance of a public security, the issuer shall submit the public security and the record of proceedings to the attorney general," who "shall approve the public security" if he "finds that the public security has been authorized to be issued in conformity with law" and then provide the comptroller "a copy of the attorney general's legal opinion stating that approval" and "the record of proceedings."), .005 ("On receipt of documents required by Section 1202.003(b)(2) from the attorney general, the comptroller shall register: (1) the public securities; and (2) the record of proceedings."); id. §§ 1371.057 ("Before an obligation may be issued or a credit agreement executed, a record of the proceedings of the issuer authorizing the issuance, execution, and delivery of the obligation or credit agreement and any contract providing revenue or security to pay the obligation or credit agreement must be submitted to the attorney general for review," who, if he or she "finds that the proceedings authorizing an obligation or credit agreement conform to the requirements of the Texas Constitution and this chapter, ... shall approve them and deliver to the comptroller a copy of the attorney general's legal opinion stating that approval and the record of proceedings."), .058 ("On receipt of the documents required by Section 1371.057(b), the comptroller shall register the record of the proceedings relating to the issuance of obligations or the execution of a credit agreement."); Tex. Water Code § 49.184(a) -(b) ("Before bonds issued by a district are delivered to the purchasers, a certified copy of all proceedings relating to the organization of the district for first bond issues and issuance of the bonds and other relevant information shall be sent to the attorney general," who "shall carefully examine the bonds, with regard to the record and the constitution and laws of this state governing the issuance of bonds, and ... shall officially approve and certify the bonds if he or she finds that they conform to the record and the constitution and laws of this state and are valid and binding obligations of the district."), (c) ("After the attorney general approves and certifies the bonds, the comptroller shall register them in a book kept for that purpose and shall record the certificate of the attorney general.").

This would be true under any of the three bond-approval and registration statutes that could govern here. See Tex. Gov't Code § 1202.006 (once "public security" is approved by Attorney General, registered with Comptroller, and issued, the "public security and any contract the proceeds of which are pledged to the payment of the public security are valid and incontestable in a court or other forum and are binding obligations for all purposes according to their terms"); id. § 1371.059 ("If proceedings to authorize an obligation or credit agreement are approved by the attorney general and registered by the comptroller, each obligation or credit agreement, as applicable, or a contract providing revenue or security included in or executed and delivered according to the authorizing proceedings is incontestable in a court or other forum and is valid, binding, and enforceable according to its terms," subject generally to the requirement that the "obligation" itself also be approved and registered in accordance with Chapter 1202); Tex. Water Code § 49.184(d) ("After the approval [by the Attorney General] and registration of the bonds by the comptroller, they shall be incontestable in any court or other forum, for any reason, and shall be valid and binding obligations in accordance with their terms for all purposes."), (e) ("A contract or lease may be submitted to the attorney general along with the bond records, and, if submitted, the approval of the attorney general of the bonds shall constitute an approval of the contract or lease and the contract or lease shall be incontestable.").

Interlocutory jurisdictional rulings in the case were the subject of Lone Star Groundwater Conservation District v. City of Conroe , 515 S.W.3d 406 (Tex. App.-Beaumont 2017, no pet.).

See, e.g. , C.W. 100 Louis Henna, Ltd. v. El Chico Rests. of Texas, L.P. , 295 S.W.3d 748, 752 (Tex. App.-Austin 2009, no pet.) ("[T]he elements of [a] breach-of-contract cause of action [are] that: (1) a valid contract existed between the parties; (2) [the claimant] had performed or tendered performance; (3) [the defendant] had breached the contract; and (4) [the claimant] was damaged as a result of the breach."); see also Mustang Pipeline Co. v. Driver Pipeline Co. , 134 S.W.3d 195, 196 (Tex. 2004) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." (citing Hernandez v. Gulf Group Lloyds , 875 S.W.2d 691, 692 (Tex. 1994) ) ).

See, e.g. , GBRA , 2015 WL 868871, at *4, 2015 Tex. App. LEXIS 1795, at *11-12 ; Alejos v. State , 433 S.W.3d 112, 117-18 (Tex. App.-Austin 2014, no pet.) ; Hotze v. City of Houston , 339 S.W.3d 809, 814-15 (Tex. App.-Austin 2011, no pet.).

See generally Tex. Gov't Code §§ 1205.021, .023, .041-.44, .062-.063, .065.

See id. §§ 1205.041, .043.

See id. §§ 1205.062, .101-.104.

See id. §§ 1205.023, .044, .151(b).

Id. § 1205.022.

Id. § 1205.002.

632 S.W.2d 146 (Tex. 1982).

Id. at 149. In Glaser , a group of the school district's taxpayers had sued the district seeking to have a bond election declared invalid under the Election Code. See id. at 147. The school district had responded by filing a proceeding under the 1979 version of the EDJA (the current version is a 1999 recodification) seeking a declaration "that the bond proceedings were valid," obtaining consolidation of the two actions as the EDJA permits, and invoking the EDJA's mechanisms for conditioning the taxpayers' continued participation in the action on their posting of a security bond determined sufficient to protect the district against damages and costs suffered from the attendant delay in being able to issue the contemplated bonds. See id. at 147-48. The taxpayers failed to post the required security bond, and the trial court dismissed the cause. See id. at 148. The material issues before the supreme court concerned what the taxpayers termed "due process" challenges to the imposition of the Act's security-bond requirement against them. See id. at 149. Applying a rational-basis analysis, the supreme court held that the security-bond requirement "was not an unreasonable or arbitrary action" in light of the requirement's policy justifications. Id.
A key component of the supreme court's reasoning was that the school district had been required under the Education Code "to submit 'all appropriate proceedings,' including the validity of the election, to the Texas Attorney General for his approval." Id. (quoting Tex. Educ. Code § 20.06 ). Within that statutory landscape, the supreme court observed, "the mere existence of the suit acts as a temporary injunction," as "[b]onds cannot be issued because of the existence of the suit." Id. ; see also Trinity River Auth. v. Carr , 386 S.W.2d 790, 794 (Tex. 1965) (orig. proceeding) (referencing the "long standing practice of the Attorney General to refuse to approve [securities] as long as litigation questioning their validity is pending"). In fact, the Glaser court added, the taxpayers had overtly pursued the goal of preventing the bond issuance by naming the Attorney General as a "nominal party to [their] initial suit to prevent approval." Glaser , 632 S.W.2d at 149. In this context, the supreme court made the statement referencing the "disgruntled taxpayer," apparently quoting the trial judge, Hon. Don Humble. It went on to find "no denial of due process" in the Legislature's imposition of the security-bond requirement "to stop the abuse," reasoning that the requirement's effect was to force the plaintiffs either to prove their entitlement to a temporary injunction (the exception to the security-bond requirement), thereby aligning their burden of proof with the effect of their suit, or else post a security bond sufficient to protect the issuer against the damages that would accrue "solely because of the pendency of the suit" in delaying the bonds' issuance (e.g., increases in interest rates or construction costs) if the suit ultimately failed. Id. ; see also Tex. Gov't Code § 1205.102 (requiring trial court, upon motion, to impose bond "unless, at the hearing on the motion, the opposing party or intervenor establishes that the person is entitled to a temporary injunction against the issuance of the public securities").

Tex. Gov't Code § 1205.025(1), (2), (3) (emphases added).

339 S.W.3d 809.

More specifically, the City of Houston had adopted an ordinance increasing the rates charged by its municipal water system, citing insufficient operational revenues to pay its projected cost of service and satisfy previously incurred bond obligations. See ids="7320295" index="40" url="https://cite.case.law/sw3d/339/809/#p814">id. at 812. Houston then filed an EDJA action in Travis County district court seeking declarations that it had legally adopted and could implement its rate ordinance without voter approval and could make future rate adjustments as the ordinance would permit. See ids="7320295" index="41" url="https://cite.case.law/sw3d/339/809/#p814">id. Two individuals intervened as "interested parties" and opposed Houston's claims on the grounds that the rate ordinance violated city charter provisions. See ids="7320295" index="42" url="https://cite.case.law/sw3d/339/809/#p814">id. at 813. The district court ruled for Houston on the merits. See ids="7320295" index="43" url="https://cite.case.law/sw3d/339/809/#p814">id. Additionally, following trial, the district court granted a motion for security bond that Houston had filed prior to trial, set the amount at $1 million, and subsequently dismissed the intervenors after they failed to comply. See ids="7320295" index="44" url="https://cite.case.law/sw3d/339/809/#p814">id. The intervenors purported to appeal the judgment on the merits, along with the order imposing the $1 million bond and the order dismissing them for failure to comply. See ids="7320295" index="45" url="https://cite.case.law/sw3d/339/809/#p814">id. We rejected challenges by the intervenors to the applicability and constitutionality of the security-bond requirement, held that the district court did not abuse its discretion in setting the security-bond amount, and dismissed the appeal of the merits based on the intervenors' failure to comply with the security-bond requirement. Id. at 815-20. Although this Court did not explicitly analyze whether Houston claims were within the EDJA, its holdings necessarily presumed that they were, as otherwise the security-bond requirement would not have come into play.

Tex. Gov't Code § 1205.021(2).

See id. § 1205.001(1) (defining "issuer" as used within EDJA to "mean[ ] an agency, authority, board, body politic, commission, department, district, instrumentality, municipality or other political subdivision, or public corporation of this state ... [and] any other type of political or governmental entity of this state"), (2) (" 'Public security' [within the EDJA] means an interest-bearing obligation, including a bond, bond anticipation note, certificate, note, warrant, or other evidence of indebtedness, regardless of whether the obligation is (A) general or special; (B) negotiable; (C) in bearer or registered form; (D) in temporary or permanent form; (E) issued with interest coupons; or (F) to be repaid from taxes, revenue, both taxes and revenue, or in another manner.").

Id. § 1205.001(3).

Id. § 1205.021(2). Specifically, Subsection (2) authorizes a declaratory judgment as to "the legality and validity of each public security authorization relating to the public securities," then elaborates:
including, if appropriate:
(A) the election at which the public securities were authorized;
(B) the organization or boundaries of the issuer;
(C) the imposition of an assessment, a tax, or a tax lien;
(D) the execution or proposed execution of a contract;
(E) the imposition of a rate, fee, charge, or toll or the enforcement of a remedy relating to the imposition of that rate, fee, charge, or toll; and
(F) the pledge or incumbrance of a tax, revenue, receipts, or property to secure the public securities.
Id. The use of "including" to precede the list would ordinarily signal an illustrative rather than exclusive enumeration. See id. § 311.005(13) ("The following definitions apply [to codes, such as the Government Code in which the EDJA is now codified] unless the statute or context in which the word or phrase is used requires a different definition: ... 'Includes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded.").

Id. § 1205.021(2)(D) & (E).

SJRA prays for "a decree, pursuant to Section 1205.151 of the [EDJA], that the declaratory judgment herein prayed for shall, as to all matters adjudicated, be forever binding and conclusive with respect to the SJRA, the Attorney General of Texas, the Comptroller, the City of Conroe, and all Interested Parties, irrespective of whether such parties filed an answer or otherwise appeared herein." See id. § 1205.151(b).

See id. §§ 1205.023, .044, .151(b).

Specifically, SJRA attached to its petition its earlier bond-approval filings with the Attorney General. These records included lists of all of the GRP Contracts and participants.

See id. § 1205.062.

See Tex. Civ. Prac. & Rem. Code § 15.020.

The Attorney General also answered and, subsequently, filed a brief in opposition to the rescission counterclaim of Quadvest and Woodland Oaks and to the jurisdictional challenges that had disputed the EDJA's applicability. The Attorney General has not filed briefing on appeal.

Both sides emphasize an explanatory letter issued by the district court in advance of its order. Although some of the reasoning set forth in this letter is echoed in the parties' arguments here, the letter in itself does not impact the standard or scope of our review. See, e.g. , Texas Bd. of Chiropractic Exam'rs. v. Texas Med. Ass'n , 375 S.W.3d 464, 482 n.24 (Tex. App.-Austin 2012, pet. denied).

See Tex. Civ. Prac. & Rem. Code § 51.014(a)(8) ("A person may appeal from an interlocutory order of a district court ... that ... grants or denies a plea to the jurisdiction by a governmental unit as that term is defined in Section 101.001.").

See GBRA , 2015 WL 868871, at *2, 2015 Tex. App. LEXIS 1795, at *5 ; see also Smith v. Lanier , 998 S.W.2d 324, 335-36 (Tex. App.-Austin 1999, pet. denied) (recognizing that dispute concerning existence of Texas probate court in rem jurisdiction over decedent's property implicated "subject-matter jurisdiction" over that res ).

See Finance Comm'n v. Norwood , 418 S.W.3d 566, 580 (Tex. 2013) (recognizing that subject-matter jurisdiction may be raised at any time and that courts may (and sometimes must) address it sua sponte (citing Texas Ass'n of Bus. v. Texas Air Control Bd. , 852 S.W.2d 440, 445-46 (Tex. 1993) ) ).

See, e.g. , City of Rockwall v. Hughes , 246 S.W.3d 621, 625-26 (Tex. 2008).

Keystone RV Co. v. Texas Dep't of Motor Vehicles , 507 S.W.3d 829, 831-32 (Tex. App.-Austin 2016, no pet.) (citing Ochsner v. Ochsner , 517 S.W.3d 717, 721 & nn. 16 & 17 (Tex. 2016) ; Jaster v. Comet II Constr., Inc. , 438 S.W.3d 556, 562 (Tex. 2014) ; City of Houston v. Bates , 406 S.W.3d 539, 543 (Tex. 2013) ; TGS-NOPEC Geophysical Co. v. Combs , 340 S.W.3d 432, 439 (Tex. 2011) ; Fresh Coat, Inc. v. K-2, Inc. , 318 S.W.3d 893, 901 (Tex. 2010) ; In re M.N. , 262 S.W.3d 799, 802 (Tex. 2008) ).

See, e.g. , Hughes , 246 S.W.3d at 625-26 ; see also In re Allen , 366 S.W.3d 696, 706 (Tex. 2012) (explaining that courts presume that the Legislature chooses words in statutes "with complete knowledge of the existing law and with reference to it." (quoting Acker v. Texas Water Comm'n , 790 S.W.2d 299, 301 (Tex. 1990) ) ); Tex. Gov't Code § 311.023 (allowing courts to consider "common law or former statutory provisions, including laws on the same or similar subjects").

See , e.g. , Richards v. Jefferson Cty. , 517 U.S. 793, 803, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996) (holding that where governmental action has "only an indirect impact" on the interests of an individual citizen, such as where a taxpayer relies on that status alone as a basis to complain of alleged misuse of public funds, citizen's interests do not implicate Due-Process protections and "the States have wide latitude to establish procedures not only to limit the number of judicial proceedings that may be entertained but also to determine whether to accord a [citizen] any standing at all"). Accord Leonard v. Cornyn , 47 S.W.3d 524, 527 (Tex. App.-Austin 1999, pet. denied) (observing, with regard to citizen's suit seeking to challenge legality of bonds issued by local governments to finance construction of facilities for professional sports teams, that "[n]o personal-liberty or interest in property is affected here").

See Andrade v. N.A.A.C.P. , 345 S.W.3d 1, 7 (Tex. 2011) (recognizing general rule in Texas that "a citizen lacks standing to bring a lawsuit challenging the lawfulness of governmental acts"); Bland Indep. Sch. Dist. v. Blue , 34 S.W.3d 547, 555-56 (Tex. 2000) (explaining that "[u]nless standing is conferred by statute" or claimant can show "a particularized injury distinct from that suffered by the general public" with respect to "challeng[ing] a governmental action or ... assert[ing] a public right," the claimant must come within "long-established exception to this general rule" by which "a [property] taxpayer has standing to sue in equity to enjoin the illegal expenditure of public funds, event without showing a distinct injury"); see also Williams v. Huff , 52 S.W.3d 171, 180 (Tex. 2001) (holding, "for prudential reasons, that paying sales tax does not confer taxpayer standing on a party" while acknowledging that status as property taxpayer would suffice); Alejos , 433 S.W.3d at 122-24 (observing that EDJA would facially permit "interested party" to intervene, subject to the security-bond requirement, despite lacking either a particularized interest or taxpayer standing).

Emphasis original.

In a reply brief, the Cities suggest a third limitation on the scope of "public security authorizations" whose "legality" and "validity" can be litigated under Section 1201.021, one derived from the term "public security authorization " itself. The Cities deduce that "public security authorization" refers to "an action or proceeding by the issuer taken, made, or proposed to be taken or made in connection with or affecting a public security" (the stated definition) in the context of the issuer's authorizing, approving, and issuing of a public security, such as "ordinances, resolutions, orders, certifications, elections and other proceedings if necessary, and other actions taken in approving and issuing a public security." This limitation, the Cities suggest, would exclude issuer actions that are not part of the initial authorization of a public security, such as the Rate Order and rates that SJRA seeks to litigate through its EDJA claims. The Cities' proposed construction of "public security authorization" is inconsistent with Hotze , which, as noted previously, tacitly recognized that the EDJA could be used to litigate certain issues regarding water-rate changes imposed by ordinance enacted subsequent to the related securities' initial authorization and issuance. See Hotze , 339 S.W.3d at 815-20.

See Tex. Gov't Code § 1205.021(2) (emphases added).

See Impose , Black's Law Dictionary (10th ed. 2014).

Tex. Gov't Code § 1205.023(1).

See Alejos , 433 S.W.3d at 117 (citing Black's Law Dictionary 864 (9th ed. 2009) ) (defining "in rem " as "involving or determining the status of a thing, and therefore the rights of persons generally with respect to the thing"); Bodine v. Webb , 992 S.W.2d 672, 676 (Tex. App.-Austin 1999, pet. denied) (observing, in a different context, that "an in rem action affects the interests of all persons in the world to the thing" (citations omitted) ); Restatement (Second) of Judgments § 6 cmt. a (Am. Law. Inst. 1982) (explaining that in "a 'true' in rem proceeding, or one 'against all the world,' ... the court undertakes to determine all claims that anyone has to the thing in question").

See Tex. Gov't Code § 1205.042.

See id. §§ 1205.041, .043.

Id. § 1205.044.

Id. § 1205.023(2).

See Richards , 517 U.S. at 803, 116 S.Ct. 1761.

See Mullane v. Central Hanover Bank & Trust Co. , 339 U.S. 306, 312-19, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (regarding special statutory proceeding to settle certain trust funds accounts, stating that Due-Process notice analysis did not hinge on classification of proceeding as "in rem " versus "in personam ," and that publication notice, while sufficient for "persons missing or unknown" or "whose interests or whereabouts could not with due diligence be ascertained," was not reasonably calculated under the circumstances to apprise beneficiaries with known identities and addresses of the action and opportunity to be heard regarding their "property rights"); see also In re E.R. , 385 S.W.3d 552, 558-61 (Tex. 2012) (discussing Mullane and numerous subsequent Supreme Court decisions and "distill[ing] a common principle: when a defendant's identity is known, service by publication is generally inadequate").

See, e.g. , Jackson v. Waller Cty. Indep. Sch. Dist. , 625 F.Supp.2d 357, 364-65 (S.D. Tex. 2008).

373 S.W.2d 525 (Tex. Civ. App.-Houston 1963, writ ref'd n.r.e.).

More specifically, Hatten concerned a proceeding brought by the City of Houston under a 1959 predecessor to the EDJA that permitted certain governmental issuers of bonds or other debt instruments to "institute a proceeding in rem in district court ... for the purpose of obtaining a declaratory judgment as to the authority of the Issuer to issue the Securities and as to the legality of all proceedings taken and/or proposed to be taken in connection therewith ... and as to the validity of the Securities to be issued." Act of May 4, 1959, 56th Leg., R.S., ch. 316, § 1, 1959 Tex. Gen. Laws 690, 690. Although the statute elaborated that the inquiry into the "proceedings" could "includ[e], in proper cases, the validity of the organization or boundaries of Issuer, any assessments of taxes levied or to be levied, and the lien of such taxes, the levy of rates, charges or tolls, and of proceedings or other remedies for the collection of such taxes, rates, charges, or tolls," it contained no explicit reference to contracts or pledges of revenues or other property. Id. Invoking this statute, Houston sought declarations to establish the validity of anticipated revenue bonds that would be secured by revenues and properties from its water system, along with that of a bond ordinance through which it made that pledge. See Hatten , 373 S.W.2d at 536-37. Included in the pledge were revenues and properties Houston had acquired under contracts with SJRA and also the Trinity River Authority (TRA). See ids="10167277" index="97" url="https://cite.case.law/sw2d/373/525/">id. at 536. At trial, a "group of citizens" who had previously sued to enjoin the bonds' issuance and who insisted the TRA contract was "invalid" sought unsuccessfully to introduce evidence concerning both contracts. See id. at 529, 536-37. The Hatten court held that the trial court had erred in excluding this evidence. It reasoned that "[a]n adjudication of the validity of the bond ordinance requires a determination of the validity of the revenues and property pledged as security and, therefore, of the Trinity River contract." See ids="10167277" index="99" url="https://cite.case.law/sw2d/373/525/">id. at 537. "For the same reasons," the court added, "the validity of the San Jacinto River contract is in issue." Id.

See id. at 536-37.

See 339 S.W.3d at 814-20. SJRA emphasizes the Hotze Court's introductory observations that "[t]he Legislature enacted the EDJA to provide issuers of public securities ... a method of quickly and efficiently adjudicating the validity of public securities and acts affecting those public securities " and that "[t]he EDJA allows an issuer to bring a special, expedited declaratory judgment action to validate proposed securities or to resolve any disputes related to public securities. " Id. at 814 (emphases added).

See ids="7320295" index="104" url="https://cite.case.law/sw3d/339/809/#p814">id. at 812-13.

See supra note 25.

2015 WL 868871, 2015 Tex. App. LEXIS 1795.

The Cities invoke the principle that courts should construe statutes, when possible, in a manner consistent with constitutional requirements. See Tex. Gov't Code § 311.021(1) (requiring courts to interpret statutes under a presumption of intended compliance with United States and Texas Constitutions); In re Allcat Claims Servs., L.P. , 356 S.W.3d 455, 468 (Tex. 2011) ("Statutes are given a construction consistent with constitutional requirements, when possible, because the legislature is presumed to have intended compliance with [the Constitution].").

See Tex. Gov't Code § 1205.023(2).

See Determan v. Irving , 609 S.W.2d 565, 567 (Tex. Civ. App.-Dallas 1980, no writ) (noting that bank holding general-obligation bonds of city intervened in EDJA action brought by city to obtain declarations regarding city's authority to issue past and future bonds in light of charter amendment limiting its taxing authority), disapproved of on other grounds , Edgewood Indep. Sch. Dist. v. Meno , 917 S.W.2d 717, 742 (Tex. 1995).

See Richards , 517 U.S. at 803-04, 116 S.Ct. 1761 (distinguishing taxpayer claims that present federal constitutional challenge "to a State's attempt to levy personal funds" from mere public-right taxpayer litigation complaining of misuse of funds or "other public action that has only an indirect impact on his interests" and holding that the former implicate Due Process).

See Allcat Claims Servs. , 356 S.W.3d at 468 (emphasis added).

See also Determan , 609 S.W.2d at 567-68 (holding that interested-party intervenors in EDJA action lacked standing to raise Due-Process challenge to notice provided under the statute because "they entered an appearance").

See supra at notes 13, 14.

See City of Galveston v. Mann , 135 Tex. 319, 143 S.W.2d 1028, 1035 (1940) (orig. proceeding) (observing that this sort of statutory regime serves "to protect the particular [issuer] and its inhabitants against the imposition of unauthorized or illegal obligations, but also to give assurance to ... intending purchasers of such [securities] that ... the purchaser will acquire an indefeasible title thereto").

See , e.g. , Meno , 917 S.W.2d at 742 (discussing prior holdings that "when the Legislature provides for the creation of a certain fund for the payment of a bond issue," federal and state constitutional limitations on impairment of contracts prevent " 'repeal[ ] by subsequent legislation without the substitution of something of equal efficacy' ") (quoting City of Aransas Pass v. Keeling , 112 Tex. 339, 247 S.W. 818, 821 (1923) ).

See Act of June 14, 1967, 60th Leg., R.S., ch. 547, § 3(xviii), 1967 Tex. Gen. Laws at 1214.

Emphasis added.

Bodine , 992 S.W.2d at 676 ; see also Tennessee Student Assistance Corp. v. Hood , 541 U.S. 440, 448, 124 S.Ct. 1905, 158 L.Ed.2d 764 (2004) ("Because the [bankruptcy] court's jurisdiction is premised on the res , ... a nonparticipating creditor cannot be subjected to personal liability."); K.D.F. v. Rex , 878 S.W.2d 589, 591-92 (Tex. 1994) (holding that suit for "fraud, defamation and other torts, for injunctive relief, and for a declaratory judgment determining the effect of contracts between [the plaintiff] and [defendants] ... cannot proceed in rem ").

See K.D.F. , 878 S.W.2d at 592 (observing that plaintiff "cannot obtain the relief it seeks through claims in tort, for injunctive relief, and for declaratory judgment determining effect of contract "unless our courts exercise in personam jurisdiction over [defendants]").

See Bodine , 992 S.W.2d at 676.

Tex. Gov't Code § 1205.023(1).

See K.D.F. , 878 S.W.2d at 591-92. This is also true if the EDJA action should more precisely be considered "quasi in rem "-in the sense of seeking judicial determination of the interests of identified persons in a res , as distinguished from a "true" in rem action "against the world"-because the Act prescribes publication notice to defined categories of interested parties. See Restatement (Second) of Judgments § 6 cmt. a (Am. Law Inst. 1982) (suggesting that contemporary interpretations of Due-Process notice requirements may require this sort of categorical notice be provided in in rem actions for stakeholders who cannot be specifically identified and observing that "this solution poses a conceptual problem with respect to the difference between 'true' in rem proceedings and 'quasi in rem' proceedings ... because persons addressed by category can be considered as identified, so that the proceeding is against specific persons rather than 'all the world' "); see also Bodine , 992 S.W.2d at 676 (explaining that "quasi in rem " refers to action that seeks to reach and dispose of the interests of particular persons in a res ). The action would still share the fundamental feature of being limited in effect to the subject property and not extending to imposing personal liability. See Bodine , 992 S.W.2d at 676 ("The effect of a judgment in both [in rem and quasi in rem ] cases ... is limited to the property that supports jurisdiction and does not impose a personal liability." (citing Shaffer v. Heitner , 433 U.S. 186, 199, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) ) ).

See Tex. Gov't Code §§ 1205.023(2) (EDJA action is "a class action binding on all persons who: (A) reside in the territory of the issuer; (B) own property located within the boundaries of the issuer; (C) are taxpayers of the issuer; or (D) have or claim a right, title, or interest in any property or money to be affected by the public security authorization or the issuance of the public securities."), .044 (effect of publication notice to class members "is that: (1) each [interested party] is a party to the action; and (2) the court has jurisdiction over each person to the same extent as if that person were individually named and personally served in the action"), .151(b) (judgment is "binding and conclusive against ... any party to the action," including interested parties).

TIC Energy & Chem., Inc. v. Martin , 498 S.W.3d 68, 74 (Tex. 2016) ("[W]e consider the statute as a whole, giving effect to each provision so that none is rendered meaningless or mere surplusage." (citing City of San Antonio v. City of Boerne , 111 S.W.3d 22, 25 (Tex. 2003) ; Howard Oil Co. v. Davis , 76 Tex. 630, 13 S.W. 665, 666 (1890) ; Lufkin v. City of Galveston , 63 Tex. 437, 439 (1885) ) ).

Cf. Hood , 541 U.S. at 447-48, 124 S.Ct. 1905 (distinguishing bankruptcy court's in rem jurisdiction to "determine all claims that anyone, whether named in the action or not, has to the [bankruptcy estate] ... against the world" from jurisdiction to impose personal liability upon a nonparticipating creditor).

See, e.g. , Greater Hous. P'ship v. Paxton , 468 S.W.3d 51, 58 (Tex. 2015) ("[W]e recognize and apply only the meanings that are consistent with the statutory scheme as a whole." (citing State v. $1,760.00 in U.S. Currency , 406 S.W.3d 177, 180 (Tex. 2013) ) ).

See Shaffer , 433 U.S. at 207, 97 S.Ct. 2569 (observing that " 'judicial jurisdiction over a thing' is a customary elliptical way of referring to jurisdiction over the interests of persons in a thing." (quoting Restatement (Second) of Conflict of Laws § 56, Introductory Note (Am. Law Inst. 1971) ) ); Restatement (Second) of Judgments § 6 cmt. a (Am. Law. Inst. 1982) (observing that "all exercises of jurisdiction," including in rem jurisdiction, "have the purpose and effect of determining interests of persons").

See , e.g. , 2015 WL 868871, at *4, 2015 Tex. App. LEXIS 1795, at *12-13 (observing that Section 1205.021"only allows issuers to seek declarations regarding a limited set of topics" and summarizing these).

See id. at *3, *5 n.6, 2015 Tex. App. LEXIS 1795, at *8-9, *15 n.6.

See id. at *2-3, *5 n.6, 2015 Tex. App. LEXIS 1795, at *6-9, *15 n.6.

See id. at *1, 2015 Tex. App. LEXIS 1795, at *1-2.

See id. at *3-7, 2015 Tex. App. LEXIS 1795, at *10-24.

See Tex. Civ. Prac. & Rem. Code § 101.0215(a)(11), (32) (including "waterworks" and "water and sewer service" among the Tort Claims Act's non-exclusive list of defined "governmental" municipal functions); Wasson Interests, Ltd. v. City of Jacksonville , 489 S.W.3d 427, 439 (Tex. 2016) (Wasson I ) (instructing lower courts to look to Section 101.025 in contract-claims context when "determining the boundaries of immunity as it relates to whether a function is proprietary or governmental"); see also Wasson Interests, Ltd. v. City of Jacksonville , --- S.W.3d ----, ----, 2018 WL 2449184, *4-5, 2018 Tex. LEXIS 514, at *10-14 (Tex. June 1, 2018) (Wasson II ) (instructing lower courts that "to determine whether governmental immunity applies to a breach-of-contract claim against a municipality, the proper inquiry is whether the municipality was engaged in a governmental or proprietary function when it entered the contract, not when it allegedly breached the contract.").

See Wasson I , 489 S.W.3d at 430 (explaining that municipalities share in State's inherent sovereign immunity when performing "governmental" functions, in concept acting "as a branch" of the State).

See, e.g. , Texas Nat. Res. Conservation Comm'n v. IT-Davy , 74 S.W.3d 849, 854 (Tex. 2002) ; Federal Sign v. Texas S. Univ. , 951 S.W.2d 401, 406-08 (Tex. 1997) ; see also City of Galveston v. State , 217 S.W.3d 466, 468-71 (Tex. 2007) (recognizing that municipalities' governmental immunity applies against the State and not merely private parties).

See Engelman Irrigation Dist. v. Shields Bros. , 514 S.W.3d 746, 750-51 (Tex. 2017) ; Rusk State Hosp. v. Black , 392 S.W.3d 88, 96 (Tex. 2012).

See, e.g. , Klumb v. Houston Mun. Emps. Pension Sys. , 458 S.W.3d 1, 27 (Tex. 2015) ("As we have previously explained, 'declaratory-judgment suits against [the State or its actors] seeking to establish a contract's validity, to enforce performance under a contract, or to impose contractual liabilities are suits against the State [and] cannot be maintained without legislative permission.' " (quoting IT-Davy , 74 S.W.3d at 855-56 ) ); City of Houston v. Williams , 216 S.W.3d 827 (Tex. 2007) (per curiam) (holding that suit for declaratory relief that would have effect of awarding retrospective monetary relief, "such as a contract dispute," implicates city's governmental immunity (quoting IT-Davy , 74 S.W.3d at 856 ) ).

See City of El Paso v. Heinrich , 284 S.W.3d 366, 371 (Tex. 2007) (discussing State v. Epperson , 121 Tex. 80, 42 S.W.2d 228, 231 (Tex. 1931), and W.D. Haden Co. v. Dodgen , 158 Tex. 74, 308 S.W.2d 838, 841 (1958) ); see also City of Houston v. Houston Mun. Empls. Pension Sys. , 549 S.W.3d 566, 578-79 (Tex. 2018) (discussing this "exception" but holding it inapplicable to statute providing merely that contracts were binding on government).

Tex. Gov't Code § 1205.022.

Tex. Civ. Prac. & Rem. Code § 15.020(a), (b) ; see In re Fisher , 433 S.W.3d 523, 529-34 (Tex. 2014) (orig. proceeding) (discussing Section 15.020 and recognizing that it is a mandatory venue statute).

Tex. Civ. Prac. & Rem. Code § 15.020(d)(3).

See id.

See id. §§ 15.003(a) (requiring, in multi-plaintiff case, that "each plaintiff must, independently of every other plaintiff, establish proper venue"), (b) (authorizing interlocutory appeal of trial court's determination that "a plaintiff did or did not independently establish proper venue" or certain determinations regarding "a plaintiff that did not independently establish proper venue"), .005 (addressing venue over multiple defendants "[i]n a suit in which the plaintiff has established proper venue against a defendant"), .062(a) (providing that "[v]enue of the main action shall establish venue of a counterclaim, cross claim, or third-party claim"), .064(a) (specifying that "[i]n all venue hearings, no factual proof concerning the merits of the case shall be required to establish venue."). "Proper venue," referenced in several of these provisions, expressly can include not only mandatory venue when applicable, but also venue as determined by the general rules of Subchapter B of Chapter 15 and the additional permissive rules of Subchapter C. See id. § 15.001(b).

Id. § 15.002(b).

Id. § 15.002(b).

571 U.S. 49, 134 S.Ct. 568, 187 L.Ed.2d 487 (2013).