# IN THE SUPREME COURT OF TEXAS

No. 18-0989

CITY OF CONROE, TEXAS; CITY OF MAGNOLIA, TEXAS;
AND CITY OF SPLENDORA, TEXAS, PETITIONERS,

V.

SAN JACINTO RIVER AUTHORITY
AND KEN PAXTON, ATTORNEY GENERAL OF TEXAS, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

**Argued January 9, 2020**

JUSTICE BUSBY delivered the opinion of the Court.

JUSTICE BLACKLOCK did not participate.

This case concerns the scope of the Expedited Declaratory Judgment Act (EDJA), which permits issuers of bonds and other public securities to resolve certain disputes regarding their securities as to all interested parties on an expedited basis. *See* TEX. GOV'T CODE ch. 1205. The San Jacinto River Authority, which has contracts to sell water to cities and other customers and uses the revenue to pay off its bonds, seeks declarations regarding the contracts and specific water rates set under them. We conclude that the EDJA gives the trial court jurisdiction to declare whether the execution of the contracts—which meets the statutory definition of public

security authorization—was legal and valid, but not whether the Authority complied with the contracts in setting specific rates. We also hold that the cities' governmental immunity does not bar an EDJA suit, which is brought *in rem* to adjudicate interests in property.

## BACKGROUND

Petitioners—the Cities of Conroe, Magnolia, and Splendora (collectively, the Cities)—are located in Montgomery County, on the northern edge of the Greater Houston metropolitan area. As Montgomery County's population has grown significantly in recent decades, so have concerns about its reliance on groundwater drawn from the Gulf Coast Aquifer. The Legislature formed the Lone Star Groundwater Conservation District to address these concerns. In 2008, the Conservation District required all large-volume groundwater users—including the Cities—to develop and implement plans for reducing their usage substantially. Mandatory groundwater-usage cutbacks took effect in January 2016.

Respondent San Jacinto River Authority (SJRA) is a legislatively created conservation and reclamation district charged with regulating the water resources of the San Jacinto River Basin. Anticipating the Conservation District's mandatory groundwater-usage cutbacks, SJRA developed a Groundwater Reduction Plan (GRP) to draw surface water from Lake Conroe, treat the water, and sell it to large-volume users.

To finance the GRP's surface-water treatment plant and related infrastructure, SJRA issued seven series of bonds between 2009 and 2016 that had an outstanding principal balance of approximately $520 million at the time this suit was filed. For each bond series, SJRA's Board of Directors adopted a resolution authorizing the bonds' issuance and delivery and specifying the bonds' purpose and terms. The resolutions pledged revenues from GRP water-sales contracts to

2

service the bond debt, maintain a bond reserve fund, and cover operation and maintenance expenses for the GRP project.

In accordance with its enabling legislation,[1] SJRA entered into bilateral GRP contracts with about 80 water-system operators (the Participants) in 2010, agreeing to provide them with surface water in exchange for monthly payments.[2] To comply with several requirements of the Texas Government and Water Codes,[3] SJRA obtained the Attorney General's approval of all the contracts and bonds, and it registered the bonds with the Comptroller. The contracts and bonds thus became "incontestable" and "valid, binding, and enforceable according to [their] terms." GOV'T CODE § 1371.059(a).

According to the GRP contracts, water payments are calculated by determining the volume of water used by each Participant and multiplying that volume by the rate SJRA's Board of Directors sets in a separate rate order that "shall be amended from time to time." Although SJRA's enabling statute empowers it to set rates sufficient to repay its bonds, the GRP rate orders and rates are governed entirely by the GRP contracts' terms. Specifically, the contracts require that "[t]he fees, rates, and charges adopted under the Rate Order" be promulgated using

---

[1] SJRA's enabling legislation requires that its water-sales fees and charges be "sufficient to produce revenue adequate . . . to pay the interest on or the principal of any bonds or other obligations issued by [SJRA] when and as same become due and payable and to fulfill any reserve or other fund obligations of [SJRA] in connection with such bonds." Act of May 25, 1967, 60th Leg., R.S., ch. 547, § 3(xviii), 1967 Tex. Gen. Laws 1212, 1214. SJRA must also "pay expenses necessary to the operation and maintenance of [SJRA's] properties and facilities . . . and such other expenses as the Board of Directors shall deem necessary and proper for any purposes." *Id.*

[2] The GRP contracts contain materially identical terms, and they are long-term obligations. The contract with Conroe terminates on December 31, 2089, or when all bonds have been repaid, whichever is later. The contracts with Splendora and Magnolia terminate on December 31, 2045, or when all bonds have been repaid, whichever is later.

[3] *See* GOV'T CODE §§ 1202.003, .005–.006, 1371.057–.059; TEX. WATER CODE § 49.184.

certain procedures and be the lowest that are: (1) consistent with good management practices by SJRA; (2) necessary and proper to meet certain GRP financial needs, including bond-debt repayment; (3) consistent with SJRA's statutory and constitutional duties and responsibilities; and (4) just, reasonable, and nondiscriminatory.[4] The dispute in this case involves SJRA's compliance with these terms.

SJRA began delivering water to Participants in September 2015, and the Conservation District's groundwater-usage cutbacks took effect in January 2016. Shortly thereafter, the City of Conroe and several other Participants challenged the groundwater-usage cutbacks as unconstitutional and in excess of the Conservation District's statutory authority.[5]

The dispute expanded to include SJRA after its 2017 fiscal-year rate order increased the fees, rates, and charges for water under the Participants' contracts.[6] The Conroe and Magnolia City Councils each passed resolutions accusing SJRA of overcharging for water in violation of its GRP contracts and questioning the legitimacy of the GRP program. These resolutions directed city officials to refuse payment of the increased rates and pay SJRA the old rates.

In response, SJRA filed this suit in Travis County, alleging that the rate increase was justified and seeking four declarations under the EDJA:

---

[4] The contracts require the rates to be sufficient to "pay the principal of, interest on, and redemption prices or costs of any Bonds or other obligations of [SJRA] issued or incurred . . . in connection with the Project or the GRP" and to "satisfy all rate covenants relating to any such Bonds or other obligations of [SJRA] relating to the Project or the GRP."

[5] That challenge is not before us. Jurisdictional rulings in the case were reviewed on interlocutory appeal in *Lone Star Groundwater Conservation Dist. v. City of Conroe*, 515 S.W.3d 406 (Tex. App.—Beaumont 2017, no pet.).

[6] "Pumpage fees" increased 7.8% from $2.32 to $2.50 per 1,000 gallons. The price for delivered groundwater increased 7.2% from $2.51 to $2.69 per 1,000 gallons.

4

1. that the SJRA is authorized to set rates for Participants pursuant to the procedures set forth in the GRP Contracts [the Authority Declaration];

2. that the SJRA issued its fiscal year 2017 Rate Order, including the setting of its fiscal year 2017 rate, in accordance with the procedures set forth in the GRP Contracts [the Compliance Declaration];

3. that the SJRA's fiscal year 2017 rate, Rate Order, and the GRP Contracts, including the Contract with Conroe, are legal and valid [the Validity Declaration]; and

4. that Conroe's refusal to pay the fiscal year 2017 rate is illegal and invalid, and its failure to pay is a breach of the GRP Contract [the Breach of Contract Declaration].

The EDJA provides an "issuer" of "public securities" an expedited declaratory procedure to establish the "legality and validity" of public securities and "public security authorizations." GOV'T CODE § 1205.021. A proceeding under the EDJA is *in rem* and requires only the Attorney General's participation; all other "interested parties" may choose to opt in after posting a bond. *Id.* §§ 1205.023, .041–.044, .063. The EDJA permits venue in Travis County. *Id.* § 1205.022.

After SJRA gave notice of its EDJA action, several Participants—including the Cities of Conroe, Magnolia, and Splendora—opted in as interested parties. The Cities then filed materially similar pleas to the jurisdiction.[7] Arguing the trial court lacked subject-matter jurisdiction to adjudicate SJRA's claims under the EDJA, the Cities alleged the claims did not seek declarations as to "the legality and validity" of a "public security authorization," but instead seek to litigate what are substantively suits on contracts that properly lie outside the statute. The Cities also asserted governmental immunity as an independent jurisdictional bar. After the trial court denied their pleas to the jurisdiction, the Cities jointly perfected an interlocutory appeal.

---

[7] The Cities also moved to transfer venue to Montgomery County, but the question of venue is not presented in this petition.

5

The court of appeals held primarily for SJRA. The court recognized that "questions regarding the EDJA's reach implicate the trial court's subject-matter jurisdiction to adjudicate the claims the Act would authorize." 559 S.W.3d 656, 668 (Tex. App.—Austin 2018). It held that the trial court properly denied the Cities' pleas to the jurisdiction as to the Authority, Compliance, and Validity Declarations, reasoning the EDJA conferred jurisdiction over these "declarations as to SJRA's own rights and the legal status of its own acts, without explicit regard to any other person or party." *Id.* at 678. But the court of appeals dismissed the Breach of Contract Declaration for want of jurisdiction, concluding it concerned *in personam* rights and therefore did not fall within the EDJA's grant of *in rem* jurisdiction. *Id.* at 678, 683. Finally, the court rejected the Cities' assertions of governmental immunity, reasoning that SJRA's arguments regarding the "complex interplay between the GRP contracts, the GRP bonds and bond covenants, SJRA's enabling statute, and statutory 'incontestability' provisions" would, if meritorious, leave no room for discretion in the parties' performance under the contracts. *Id.* at 681. The Cities filed a petition for review concerning the court of appeals' disposition of their interlocutory appeal, which we granted. SJRA does not challenge the court of appeals' ruling dismissing the Breach of Contract Declaration.

## ANALYSIS

In this Court, the Cities present two jurisdictional issues. First, they ask us to determine whether the Authority, Compliance, and Validity Declarations fall within the EDJA's scope as declarations of the legality or validity of "public security authorizations." Second, they ask whether they have governmental immunity from this EDJA action. We address each issue in turn.

6

## I. The EDJA permits jurisdiction over some but not all of SJRA's requested declarations.

The Cities argue that the Authority, Compliance, and Validity Declarations are not permitted by the EDJA's text and do not implicate the concerns it was enacted to address. In response, SJRA and the Attorney General contend the EDJA expressly confers jurisdiction over all three declarations because they address the legality and validity of public security authorizations.

Whether a court has jurisdiction is a question of law, which we review de novo. *McFadin v. Broadway Coffeehouse, LLC*, 539 S.W.3d 278, 282–83 (Tex. 2018). We also review questions of statutory construction de novo, seeking to "ascertain and give effect to the Legislature's intent as expressed by the language of the statute." *City of Houston v. Hous. Mun. Emps. Pension Sys.*, 549 S.W.3d 566, 580 (Tex. 2018). We do not construe statutory provisions in isolation. *Aleman v. Tex. Med. Bd.*, 573 S.W.3d 796, 802 (Tex. 2019). Instead, we "consider the context and framework of the entire statute." *Id.* (citing *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 325 (Tex. 2017)).

The EDJA was enacted to "stop 'the age old practice allowing one disgruntled taxpayer to stop the entire bond issue simply by filing suit.'" *Buckholts Indep. Sch. Dist. v. Glaser*, 632 S.W.2d 146, 149 (Tex. 1982) (construing the EDJA's predecessor statute). The EDJA "allows an issuer to bring a special, expedited declaratory judgment action to validate proposed public securities or to resolve" certain disputes relating to public securities. *Guadalupe-Blanco River Auth. v. Texas Attorney General*, No. 03-14-00393-CV, 2015 WL 868871, at *4 (Tex. App.—Austin Feb. 26, 2015, pet. denied) (citing GOV'T CODE § 1205.021). It also allows an issuer to obtain declaratory judgments as to "the legality and validity of each public security authorization

relating to the public securities." GOV'T CODE § 1205.021(2). Resolving a controversy through an EDJA action ends that controversy once and for all: a final judgment is binding on all "interested parties"[8] and is an injunction against future attacks. *Id.* §§ 1205.023, .041, .151.

SJRA is an "issuer" under the EDJA, and the bonds SJRA issued are "public securities." The point of contention between the parties is whether SJRA's Authority, Compliance, and Validity Declarations address the "legality and validity" of one or more "public security authorization[s]" as defined by the EDJA. Specifically, the parties dispute whether the GRP contracts, SJRA's rate order, and the rates SJRA set are public security authorizations. The Attorney General and SJRA argue these items meet the definition of public security authorization in section 1205.001(3) of the Government Code. Because the declarations address the legality and validity of these public security authorizations, they contend, the trial court has jurisdiction to make the declarations under the EDJA.[9]

Section 1205.001 defines a public security authorization as "an action or proceeding by an issuer taken, made, or proposed to be taken or made in connection with or affecting a public security." *Id.* § 1205.001(3). Section 1205.021 sheds further light on this definition, though the

---

[8] "Interested parties" include those who: reside in the issuer's territory; own property located within the issuer's boundaries; are taxpayers of the issuer; or "have or claim a right, title, or interest in any property or money to be affected by the public security authorization or the issuance of the public securities." GOV'T CODE §§ 1205.023, .041.

[9] The Attorney General and SJRA contend the Cities failed to challenge these items' status as public security authorizations by arguing only that they do not fit within section 1205.021(2)'s non-exclusive list of such authorizations. This list and the definition of "public security authorization" are not mutually exclusive; rather, as we will explain, the list contained in section 1205.021(2) informs the term's definition. Moreover, the Cities' petition presents the issue broadly, asking whether "the statutory limitations on the scope of the EDJA, properly construed, include the claims SJRA pleads in the underlying lawsuit." We decline to hold the Cities have conceded that the contracts, rate order, and rates are public security authorizations, and we will examine them accordingly.

parties dispute the section's effect. It provides in relevant part that an issuer may bring an EDJA action to obtain a declaratory judgment as to "the legality and validity of each public security authorization relating to the public securities, including if appropriate" the following:

(A) the election at which the public securities were authorized;

(B) the organization or boundaries of the issuer;

(C) the imposition of an assessment, a tax, or a tax lien;

(D) the execution or proposed execution of a contract;

(E) the imposition of a rate, fee, charge, or toll or the enforcement of a remedy relating to the imposition of that rate, fee, charge, or toll; and

(F) the pledge or encumbrance of a tax, revenue, receipts, or property to secure the public securities.

*Id.* § 1205.021(2).

SJRA contends the EDJA broadly defines public security authorization and argues section 1205.021(2)'s list of authorizations has little bearing on the term's definition. In its view, an action or proceeding need only be "in connection with or affecting a public security" to qualify, no matter how tangential that connection may be. The Cities disagree, arguing these examples limit the permissible subjects for EDJA suits.

"Typically, when applying statutes requiring a connection between two things, our analysis hinges on how direct that connection must be." *Aleman*, 573 S.W.3d at 802. We consider the statute as a whole, which may "further delimit[] the scope of the required connection." *Id.* at 803. Two such limitations appear here: (1) the Legislature's choice to term certain actions "public security *authorizations*," and (2) a list of actions and proceedings that the Legislature has concluded fall under this term.

The Legislature's use of the word "authorization" in defining the term indicates that an authorizing connection with or effect on the public securities is required. *See Cameron v. Terrell*

9

*& Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981) (recognizing that in construing statutes, we presume every word was used for a purpose). "Authorization" generally refers to "[o]fficial permission to do something,"[10] or "permission or power granted by an authority."[11] In the public securities context, authorization has long referred to the initial actions or approvals needed to ensure the proper issuance of public securities.[12] Numerous provisions in the EDJA confirm this view, discussing various authorizations affecting the relevant public securities as a whole.[13] Thus, we hold that a public security authorization must have an *authorizing* connection with or effect on the public securities. Ordinarily, an action or proceeding constituting a public security authorization will occur before or close in time to the public security's issuance.

The list in section 1205.021(2) further clarifies which actions the Legislature views as having such an authorizing connection. As we recently explained, the Legislature may delimit a statutory term's scope "by providing a finite list of acts" it believes meets that term's "overarching description." *Aleman*, 573 S.W.3d at 805. Although we agree with the Attorney General and SJRA that this list does not specify every public security authorization, it does shed

---

[10] *Authorization*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[11] *Authorization*, WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY (1st ed. 1996).

[12] *See Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 841 (Tex. 2010) (discussing "bond authorization measures" which, if approved by voters, would allow issuance of bonds); *City of Galveston v. Hill*, 519 S.W.2d 103, 104 (Tex. 1975) (mentioning the Attorney General's review of "[t]he record relating to the authorization of . . . bonds" prior to their issuance); *Brazos River Auth. v. Carr*, 405 S.W.2d 689, 693 (Tex. 1966) (mentioning the "authorization, issuance, and sale" of bonds); *State ex rel. Abney v. Miller*, 128 S.W.2d 1134, 1135–36 (Tex. 1939) (concerning the "authorization for the creation" of bond-issuing districts).

[13] *See* GOV'T CODE § 1205.021(2)(A) (providing that "the election at which the public securities were authorized" constitutes a public security authorization); *id.* § 1205.025(2) (permitting issuer to bring EDJA action "before or after the public securities are authorized, issued, or delivered"); *id.* § 1205.061 (permitting court to enjoin proceeding contesting validity of "authorized" charge "to be imposed or made for the payment of the public securities or interest" thereon).

light on which actions have an authorizing connection with public securities in the subject areas expressly addressed.

For example, subsection (F) identifies the actions that the Legislature has concluded have authorizing connections with public securities as to the money or property securing them. Gov't Code § 1205.021(2)(F). Subsection (F) provides that "the pledge or encumbrance of a tax, revenue, receipts, or property to secure the public securities" constitutes a public security authorization. *Id.* Importantly, the Legislature did not provide that "tax[es], revenue[s], receipts, or propert[ies]" by themselves are public security authorizations. *See id.* Rather, the *pledge* or *encumbrance* of that money or property are the acts that have an authorizing connection with the securities. *Id.* §§ 1205.001(3), .021(2)(F); *see King v. Jefferson Cty. Water Control & Improvement Dist. No. 7*, 281 S.W.2d 185, 186 (Tex. App.—Austin 1995, writ ref'd) (discussing pledge of revenues in authorizing bonds).

With this meaning of public security authorization in mind, we consider the parties' arguments regarding whether each of SJRA's requested declarations address the legality or validity of a public security authorization. SJRA and the Attorney General contend the GRP contracts, rate order, and rates themselves are public security authorizations because they are all connected to the bonds SJRA issued to finance the GRP Project: the contracts' revenues are pledged to repay the bonds, SJRA uses the rate order to generate revenues to pay the bonds, and the rates ensure sufficient contract revenues to repay the bonds. Because each declaration addresses the legality or validity of one or more of these authorizations, they conclude all are within the scope of the EDJA. SJRA and the Attorney General also argue that, although not required, each declaration falls within section 1205.021(2)'s list. The Attorney General asserts

11

that all three requested declarations fall within the scope of subsection (E) because they concern the imposition of a rate relating to the bonds, which SJRA's enabling legislation requires. SJRA argues the declarations mirror examples (D) and (E).

In the Cities' view, SJRA's declarations are not within the EDJA because they do not concern the legality and validity of SJRA's *execution* of a contract under (D), nor do they concern the legality and validity of the *imposition* of a rate, fee, charge, or toll under (E). The "execution or proposed execution of a contract" is not at issue, according to the Cities, because execution does not refer to questions that may arise later during the life of the contract, such as judicial construction of its terms or determining a party's compliance with those terms. The "imposition of a rate, fee, charge, or toll" is likewise not at issue, they maintain, because impose means to levy or exact pursuant to the exercise of government authority, not by contract.

We first address the Authority Declaration requested by SJRA, which provides that "SJRA is authorized to set rates for Participants pursuant to the procedures set forth in the GRP Contracts." In essence, the Authority Declaration concerns the legality and validity of SJRA's contracts with GRP Participants, as GRP rate orders and rates are creatures of the contracts. As we have long held, contracts must be properly executed to be valid. *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007) (recognizing execution of contract is required for enforceable contract). The execution of these contracts undoubtedly has an authorizing connection with the bonds: the GRP contracts were executed in 2010, in close temporal proximity to the bonds' issuance, and their revenues were immediately pledged as the sole source of repayment securing SJRA's bonds. Furthermore, "the execution . . . of a contract" explicitly qualifies as a public security authorization under section 1205.021(2). GOV'T CODE § 1205.021(2)(D). Thus, insofar

12

as the Authority Declaration concerns the valid execution of the GRP contracts, the EDJA permits the trial court to exercise jurisdiction over this declaration. *See id.*

Next, we consider the requested Compliance Declaration, which provides that "SJRA issued its fiscal year 2017 Rate Order, including the setting of its fiscal year 2017 rate, in accordance with the procedures set forth in the GRP Contracts." Because the Compliance Declaration concerns the validity of the rate order and the rates set therein, we must determine whether the rate order, the rates, or both have an authorizing connection with the bonds and therefore qualify as public security authorizations. We hold such a connection is lacking. The rate order and rates were established in 2016, six years after the contracts were executed and most of the bonds issued, and neither was approved by the Attorney General as part of the bond approval.[14] Even though the rate order and rates may affect the amount SJRA is paid under the contracts, neither has an authorizing connection with the public securities. *See id.* § 1205.001(3).

Further, as explained above, the Legislature illustrated in section 1205.021(2) which actions have an authorizing connection with or effect on public securities in the subject areas expressly addressed. The EDJA does not treat compliance with a contract as a public security authorization;[15] it provides that *execution* of a contract meets that definition. *Id.* § 1205.021(2)(D). To the extent the Compliance Declaration pertains to SJRA's contractual *authority* to issue a rate order and rates that comply with the GRP contracts because those

---

[14] Of the approximately $554 million in bonds issued by SJRA between 2009 and 2016, only $2.3 million were issued in 2016.

[15] It is also difficult to see how a suit on this question would be *in rem*—i.e., adjudicate a public entity's right to identified property. *See* GOV'T CODE § 1205.023.

contracts were validly executed, SJRA may request an EDJA declaration to that effect. *Id.* It may not use the EDJA to establish its compliance with the contract, however.

Section 1205.021(2) also provides that issuers may request a declaration concerning the legality and validity of "the imposition of a rate." *Id.* § 1205.021(2)(E). The parties dispute whether this provision applies to SJRA's issuance of a particular rate order and setting of specific rates under the GRP contracts.[16]

The Cities contend the imposition of a rate is not at issue here because rates, fees, charges, and tolls that are "imposed" are put in place by the power of government, not pursuant to contractual provisions. The trial judge agreed, reasoning that "a contractual rate increase is not the imposition of a rate [under] section 1205.021"; rather, subsection (E) "connotes . . . the exercise of governmental authority *vis-à-vis* a broad class of citizenry." The Attorney General responds that no such limitation appears in the EDJA, and SJRA's enabling legislation empowers it to issue rate orders. SJRA contends it "imposes" rates in its rate orders to provide revenues for bond repayment.

We conclude that subsection (E) does not encompass the Compliance Declaration. The parties' arguments regarding the imposition of a rate have two distinct but related parts: (1) SJRA's ability to issue a rate order and rates pursuant to its statutory rate-setting

---

[16] In full, subsection (E) provides that "the imposition of a rate, fee, charge, or toll or the enforcement of a remedy relating to the imposition of that rate, fee, charge, or toll" constitutes a public security authorization. *Id.* § 1205.021(2)(E). SJRA does not argue that it is seeking a declaration regarding the enforcement of a remedy relating to the imposition of a rate. We therefore note only that this portion of (E) is also consistent with our holding that section 1205.001(3) requires an action or proceeding to have an authorizing connection with a public security. The Cities have suggested that this portion of (E) could include, for example, a turnpike authority's power to collect surcharges from motorists who evade tolls "imposed" by that authority.

authority, and (2) SJRA's compliance with the GRP contracts' terms in issuing a particular rate order and rate. As the Attorney General points out, the Legislature statutorily empowered SJRA to set and collect rates "by resolution or order" sufficient to repay its bonds.[17] But the Compliance Declaration does not concern this statutory authority; it asks for a declaration that SJRA complied with the GRP contracts in issuing a particular rate order that set the specific rates at issue here. As discussed above, subsection (D) addresses contracts, and it does not extend to declaring compliance with a contract's terms. Likewise, subsection (E) addresses the statutory validity of imposing a rate, not whether a specific rate amount complies with contractual restrictions and procedures.

As noted, the Legislature provided a list of actions in section 1205.021(2) that it concluded constitute public security authorizations. The items in this list have a common trait: each affects the many enumerated contestants bound by EDJA judgments.[18] The rate order and rates at issue here do not: they directly affect *only* SJRA and its GRP Participants. *Cf. Buckholts*, 632 S.W.2d at 150. Because SJRA does not seek a declaration concerning the imposition of a rate relating to a public security, we hold the EDJA does not permit the trial court to exercise jurisdiction over the Compliance Declaration.

Finally, we consider SJRA's requested Validity Declaration, which provides that "SJRA's fiscal year 2017 rate, Rate Order, and the GRP Contracts, including the Contract with

---

[17] *See* Act of May 25, 1967, 60th Leg., R.S., ch. 547, 1967 Tex. Gen. Laws 1212.

[18] *See* GOV'T CODE §§ 1205.021(2), .023(2); *Aleman*, 573 S.W.3d at 802 (considering commonalities among listed items to construe statute's application to given scenario); *Narmah v. Waller Indep. Sch. Dist.*, 257 S.W.3d 267, 271 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (explaining Legislature's purpose in enacting EDJA to "provide a 'speedy final resolution of all contestants' claims' in public-securities declaratory-judgment proceedings" (quoting *Buckholts*, 632 S.W.2d at 150)).

15

Conroe, are legal and valid." This declaration merely restates and combines SJRA's two prior requests. Our analysis of those declarations' proper scope therefore applies to this declaration as well. Specifically, the EDJA confers jurisdiction to declare whether the GRP contracts (as public security authorizations) are legal and valid, but it does not extend to declaring whether a specific rate amount set in a particular rate order is valid.

We note that the parties have submitted extensive briefing regarding the constitutional-doubt canon of statutory construction. According to the Cities, we must construe the EDJA so it permits only suits concerning public, *in rem* rights in order to avoid due process concerns arising from the EDJA's minimal notice provisions. They contend that SJRA's requested declarations concern purely private, *in personam* contract rights, so the EDJA cannot support jurisdiction over those claims. SJRA disagrees, contending these are no ordinary contracts due to their statutory incontestability,[19] adjudicating the claims at issue presents no constitutional problem, and the requested declarations impose no personal liability on and foreclose no defenses by the Cities.[20] The Attorney General similarly contends we should not perform a due-process analysis to determine whether the declarations fall within the scope of the EDJA.

---

[19] Throughout this litigation, SJRA has argued that the Attorney General's approval of its bonds and contracts make those items incontestable by any parties who seek to invalidate or challenge them. The Cities urge us to hold that incontestability does not prevent the Cities and other counterparties to SJRA's contracts from litigating common-law claims and defenses contesting those contracts. In their view, the constitutional-doubt canon requires this result. SJRA responds that incontestable means precisely what it says: not contestable. The Attorney General, however, argues the meaning of incontestability is not before us; thus, we need not decide it. We agree with the Attorney General. The scope of this interlocutory appeal is limited to the denial of the Cities' pleas to the jurisdiction concerning the EDJA, and incontestability does not inform that analysis. Should the parties choose, they may present their arguments on remand regarding the role of incontestability statutes in EDJA litigation.

[20] SJRA insists it simply seeks declarations as to SJRA's own rights and the legal status of its own acts without explicit regard to any other party. But as the Cities note, SJRA's press release

We need not address these arguments. Under our construction of the EDJA, SJRA may not obtain EDJA declarations concerning the Cities' *in personam* rights and liabilities. The EDJA permits only *in rem* declarations concerning property rights.

In sum, we hold that a public security authorization under the EDJA must have an authorizing connection with or effect on the public securities at issue. GOV'T CODE § 1205.001(3). The execution of the GRP contracts is the only action or proceeding in question that constitutes a public security authorization under the EDJA. Section 1205.021 therefore gives the trial court jurisdiction to declare whether the execution of those contracts was legal and valid. We reject SJRA's contention that the EDJA also permits declarations concerning compliance with the contracts. *See id.* § 1205.021(2)(D). We further hold that SJRA's rate order and rates established under the contracts do not have an authorizing connection with the bonds and do not implicate SJRA's statutory authority to impose a rate. *See id.* §§ 1205.001(3), .021(2)(E). Therefore, they are not public security authorizations, and the trial court lacks jurisdiction to declare their legality or validity.

**II.      The Cities do not have governmental immunity from this EDJA suit.**

The Cities also contend the court of appeals improperly rejected their pleas to the jurisdiction based on governmental immunity. Governmental immunity protects political subdivisions, such as cities, from suits against them unless waived by the Legislature through "clear and unambiguous language." *Harris County v. Annab*, 547 S.W.3d 609, 613 (Tex. 2018). "An assertion of governmental immunity implicates courts' subject-matter jurisdiction" and "is

concerning this litigation indicates that SJRA intends to obtain these declarations to preemptively adjudicate the Cities' rights in a subsequent breach-of-contract action.

17

properly asserted in a plea to the jurisdiction." *Id.* at 612 (cleaned up). We review the trial court's ruling on a plea to the jurisdiction de novo. *Id.* Although the Legislature determines when immunity is waived, "the judiciary has historically been, and is now, entrusted with defining the boundaries of [governmental immunity] and determining under what circumstances . . . immunity exists in the first instance." *Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 432 (Tex. 2016) (cleaned up).

The Cities contend that even if the EDJA permits some or all of SJRA's requested declarations, the trial court lacks subject-matter jurisdiction to consider them because the Cities have governmental immunity from this suit. According to the Cities, governmental immunity bars SJRA's claims because the Legislature did not waive immunity unambiguously in the EDJA, and the court of appeals erred by holding a narrow exception applied. SJRA responds that immunity poses no bar to the trial court's exercise of EDJA jurisdiction, as the Cities voluntarily intervened in this litigation.[21] In addition, SJRA and the Attorney General assert that EDJA proceedings do not implicate immunity because they are *in rem*, are not suits *against* the Cities, and do not impose personal liability. We agree with the Attorney General and SJRA that because EDJA suits concern only *in rem* rights, immunity does not apply.

---

[21] SJRA also points out that the Legislature waived immunity in Local Government Code section 271.152 when governments enter into contracts for goods and services, and it argues these declarations concern such contracts. But section 271.152 waives a local government entity's immunity "to suit for the purpose of adjudicating a claim for breach of the contract." TEX. LOC. GOV'T CODE § 271.152. SJRA has denied that its EDJA action seeks to adjudicate a claim for breach of contract. Therefore, section 271.152 does not apply. *City of New Braunfels v. Carowest Land, Ltd.*, 578 S.W.3d 668, 675 (Tex. App.—Austin 2019, no pet.) ("Chapter 271's waiver of immunity from suit to allow adjudication of a claim for breach of contract does not waive immunity from suit for a declaration of rights under a contract when there is no pleaded breach-of-contract action.").

18

A proceeding under the EDJA is an *in rem* proceeding, GOV'T CODE § 1205.023(1), meaning it is an action "instituted directly against a thing, . . . taken directly against property, or . . . brought to enforce a right in the thing itself." *Bodine v. Webb*, 992 S.W.2d 672, 676 (Tex. App.—Austin 1999, pet. denied). "The general rule of *in rem* jurisdiction is that the court's jurisdiction is dependent on the court's control over the defendant *res*." *Costello v. State*, 774 S.W.2d 722, 723 (Tex. App.—Corpus Christi 1989, writ denied). "[A]n *in rem* action affects the interests of all persons in the world in the thing," but an *in rem* judgment's effect is limited only "to the property that supports jurisdiction." *Bodine*, 992 S.W.2d at 676. The court need not acquire jurisdiction over the person. *See Batjer v. Roberts*, 148 S.W. 841, 842 (Tex. App.—El Paso 1912, writ ref'd) (observing that service of process in *in rem* suits may be constructive, and persons with interest in *res* may never know of suit).

In determining whether immunity exists, "we take as guides both the nature and purposes of immunity,"[22] which include shielding the State and its political subdivisions "from the costs and consequences of improvident actions of their governments." *City of Galveston v. State*, 217 S.W.3d 466, 472 (Tex. 2007). "A lack of immunity may hamper governmental functions by requiring tax resources to be used for defending lawsuits and paying judgments rather than using those resources for their intended purposes." *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 375 (Tex. 2006). We hold that suits under the EDJA do not implicate the policies that underpin our immunity jurisprudence.

First, *in rem* suits brought under the EDJA do not subject governments to the "costs and consequences" of improvident government actions because issuers—government entities

---

[22] *Wasson Interests*, 489 S.W.3d at 432.

19

themselves—are the very entities the EDJA protects. *City of Galveston*, 217 S.W.2d at 472. Second, as SJRA and the Attorney General point out, EDJA suits pose little risk to the public treasury. The Cities—though among the "interested parties" under the statute—are not required to expend financial resources to defend EDJA litigation. *Cf. Reata*, 197 S.W.3d at 375 ("A lack of immunity may hamper governmental functions by *requiring* tax resources to be used for defending lawsuits . . . ." (emphasis added)). Rather, they may choose to do so. GOV'T CODE § 1205.062.

Although we understand the Cities' concern that interested parties under the statute will be bound by EDJA judgments whether or not they intervene, we conclude protection against this sort of judgment is not the purpose of immunity. We have explained that governmental immunity protects against "hamper[ing] government functions by requiring tax resources to be used for . . . paying judgments." *Reata*, 197 S.W.3d at 375. EDJA judgments impose no personal liability and thus require no payment. *Bodine*, 992 S.W.2d at 676. They affect only the *res* at the heart of the suit: public securities, the issuer's authority to issue them, public security authorizations, or expenditures of money relating to the public securities. *See* GOV'T CODE § 1205.021(1)–(4)*.*

Moreover, our construction of the EDJA's permissible scope limits any concern that *in rem* declarations will be used to circumvent immunity. Issuers cannot seek declarations under the EDJA to adjudicate a claim for breach of contract or to declare their own compliance with a contract.

## CONCLUSION

We hold that the EDJA permits the trial court to exercise jurisdiction over SJRA's proposed Authority and Validity Declarations insofar as they concern the valid execution of the GRP contracts, but it does not confer jurisdiction over the proposed Compliance Declaration. We also hold that the Cities' governmental immunity does not bar this EDJA suit. We do not disturb the court of appeals' holding that the EDJA does not confer jurisdiction over the Breach of Contract Declaration. We therefore reverse the court of appeals' judgment in part and remand the case to the trial court for further proceedings.

_____
J. Brett Busby
Justice

**OPINION DELIVERED:** March 27, 2020

21